**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF MINNESOTA, *ex rel. Governor Tim Walz and Attorney General Keith Ellison*, | § | |
| *Plaintiff*, | § | |
| v. | § | CIVIL ACTION NO. 1:26-CV-00906 |
| GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and | § | |
| MANUEL TREVINO, *in his official capacity as Sheriff of Cameron County, Texas*, | § | |
| *Defendants*. | § | |

**DEFENDANT GREG ABBOTT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR EMERGENCY RELIEF**

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 2

SUMMARY OF THE ARGUMENT ..... 6

ARGUMENT ..... 7

- I. Because Minnesota's Extraordinary Request Fails at the Threshold, this Court Lacks Authority to Grant Relief. ..... 7
  - A. This effort to short-circuit Governor Abbott's deliberations—before a denial has even issued—is not ripe. ..... 8
  - B. Sovereign immunity bars this suit against the Governor of Texas for his efforts to comply with the Extradition Clause. ..... 10
  - C. Nothing authorizes Minnesota to conscript federal courts into issuing writs of mandamus to state officers here. ..... 13
  - D. The Supreme Court of the United States is the only appropriate venue for this dispute between two States. ..... 16
- II. Minnesota Is Not Likely to Succeed on the Merits ..... 17
  - A. Governor Abbott has a solemn obligation to determine whether all predicates are met to trigger the extradition power. ..... 17
  - B. The obligation to determine predicate facts is not ministerial, as evidenced by a century of practice and precedent. ..... 19
  - C. Preliminary public evidence suggests that Mr. Castro is not a fugitive within the meaning of the Constitution. ..... 21
- III. The Remaining Factors Counsel in Favor of Denying Emergency Relief. ..... 25
  - A. Because Governor Abbot may issue a warrant more than 90 days after Mr. Castro's arrest, Minnesota faces no irreparable harm. ..... 25
  - B. The balance of the equities tips in favor of Governor Abbott's considered deliberation, not Minnesota's rush to judgment. ..... 27
  - C. The public interest requires a meaningful effort to ensure the liberty of an American is not restrained in violation of the Constitution. ..... 29

CONCLUSION ..... 30

CERTIFICATE OF SERVICE ..... 32

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Alabama v. California*,
145 S. Ct. 757 (2025) ... 17
*Alabama ex rel. Governor & Atty. Gen. v. Engler*,
85 F.3d 1205 (6th Cir. 1996) ... 21
*Appleyard v. Massachusetts*,
203 U.S. 222 (1906) ... 18, 20, 23
*Application of Simpson*,
586 P.2d 1389 (Kan. Ct. App. 1978) ... 25
*Bassing v. Cady*,
208 U.S. 386 (1908) ... 18, 23
*Biddinger v. Comm'r of Police,*
245 U.S. 128 (1917) ... 18
*California v. Superior Ct. of Calif.*,
482 U.S. 400 (1987) ... 17, 18
*California v. West Virginia*,
454 U.S. 1027 (1981) ... 16
*Chiaverini v. City of Napoleon*,
602 U.S. 556 (2024) ... 30
*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ... 17
*Colorado v. Kansas*,
320 U.S. 383 (1943) ... 10
*Cummings v. Missouri*,
71 U.S. 277 (1867) ... 6
*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ... 8
*Foucha v. Louisiana*,
504 U.S. 71 (1992) ... 29
*Gerstein v. Pugh*,
420 U.S. 103 (1975) ... 29
*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
415 U.S. 423 (1974) ... 6
*Hogan v. O'Neill*,
255 U.S. 52 (1921) ... 30
*Hyatt v. Corkran*,
188 U.S. 691 (1903) ... 4, 12, 18, 19, 20, 23, 24

*J.W. v. Paley*,
81 F.4th 440 (5th Cir. 2023) ........ 17
*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
920 F.2d 262 (5th Cir. 1990) ........ 7
*Kentucky v. Dennison*,
24 How. (65 U.S.) 66 (1861) ........ 15, 16, 19
*La Buy v. Howes Leather Co.*,
352 U.S. 249 (1957) ........ 15
*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ........ 13
*Louisiana v. Mississippi*,
488 U.S. 990 (1988) ........ 16–17
*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*,
446 F.2d 353 (5th Cir. 1971) ........ 27
*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ........ 7
*Maryland v. Louisiana*,
451 U.S. 725 (1981) ........ 12
*McIntyre v. Wood*,
7 Cranch (11 U.S.) 504 (1813) ........ 15
*Miami Beach Fed. Sav. & Loan Ass'n v. Callander*,
256 F.2d 410 (5th Cir. 1958) ........ 7
*Michel v. Louisiana*,
350 U.S. 91 (1955) ........ 23
*Michigan v. Doran*,
439 U.S. 282 (1978) ........ 17–18, 19, 21
*Mississippi v. Johnson*,
71 U.S. 475 (1866) ........ 19
*Mississippi v. Louisiana*,
506 U.S. 73 (1992) ........ 16
*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) ........ 7
*Moye v. Clerk, DeKalb County Superior Court*,
474 F.2d 1275 (5th Cir. 1973) (per curiam) ........ 15
*Nat'l Park Hosp. Ass'n v. Dept. of Interior*,
538 U.S. 803 (2003) ........ 8
*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
833 F.2d 583 (5th Cir. 1987) ........ 8
*Nken v. Holder*,
556 U.S. 418 (2009) ........ 27
*PennEast Pipeline Co. v. New Jersey*,
594 U.S. 482 (2021) ........ 11

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ........ 12, 28
*People ex rel. McNichols v. Pease*,
207 U.S. 100 (1907) ........ 21
*Peters v. Davis*,
No. CV H-18-3204, 2019 WL 127076 (S.D. Tex. Jan. 7, 2019) ........ 14, 16
*Pierce v. Creecy*,
210 U.S. 387 (1908) ........ 19
*Precision Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*,
324 U.S. 806 (1945) ........ 29
*Principality of Monaco v. Mississippi*,
292 U.S. 313 (1934) ........ 11
*Puerto Rico v. Branstad*,
483 U.S. 219 (1987) ........ 9, 10, 15, 16, 18, 19
*Ex parte Reggel*,
114 U.S. 642 (1885) ........ 15, 18, 19, 20, 29
*Roberts v. Reilly*,
116 U.S. 80 (1885) ........ 2, 12, 18, 20, 23
*Sampson v. Murray*,
415 U.S. 61 (1974) ........ 6
*Shields v. Norton*,
289 F.3d 832 (5th Cir. 2002) ........ 8
*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ........ 9
*Steel Co. v. Citizens for a Better Enviro.*,
523 U.S. 83 (1998) ........ 7, 16
*Susan B. Anthony's List v. Driehaus*,
573 U.S. 149 (2014) ........ 8
*Texas v. California*,
141 S. Ct. 1469 (2021) ........ 17
*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ........ 24
*Texas v. United States*,
523 U.S. 296 (1998) ........ 8
*Texas v. Ysleta del Sur Pueblo*,
No. EP-17-CV-179-PRM, 2018 WL 1566866 (W.D. Tex. Mar. 29, 2018) ........ 6
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 16
*United Sovereign Americans, Inc. v. Nelson*,
762 F. Supp. 3d 523 (N.D. Tex. 2025) ........ 14
*United States v. Chem. Found.*,
272 U.S. 1 (1926) ........ 9

*United States v. Frank*,
864 F.2d 992 (3d Cir. 1988) ........ 23
*United States v. Palomar-Santiago*,
593 U.S. 321 (2021) ........ 22
*United States v. Texas*,
143 U.S. 621 (1892) ........ 11, 16
*U.S. ex rel. Knapp v. Lake Shore & M.S.R. Co.*,
197 U.S. 536 (1905) ........ 15
*U.S. ex rel. McCline v. Meyerling*,
75 F.2d 716 (7th Cir. 1934) ........ 21
*Voisine v. United States*,
579 U.S. 686 (2016) ........ 22
*In re Voorhees*,
32 N.J.L. 141 (1867) ........ 23
*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 28
*Whole Women's Health v. Jackson*,
595 U.S. 30 (2021) ........ 12
*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ........ 9
*Winter v. Nat. Res. Def. Couns., Inc.*,
555 U.S. 7 (2008) ........ 27, 28
*Ex parte Young*, 209 U.S. 123 (1908) ........ 11, 12, 13

**Constitutional Provisions, Statutes, and Rules:**

U.S. CONST. art. III, § 2, cl. 1–2 ........ 16
U.S. CONST. art. IV, § 2, cl. 2 ........ 1, 4, 22
U.S. CONST. art. VI, cl. 2 ........ 12
18 U.S.C.:
§ 1073 ........ 23
§ 3182 ........ 17
28 U.S.C.:
§ 1251(a) ........ 16
§ 1331 ........ 14
§ 1361 ........ 14
§ 1367 ........ 14
§ 1651(b) ........ 15
42 U.S.C. § 1983 ........ 9
FED. R. CIV. P. 81(b) ........ 14
TEX. CODE CRIM. PROC. art. 51.13:
§ 4 ........ 5, 8, 20
§ 15 ........ 10, 30

§ 16 .... 26
§ 17 .... 10, 30
§ 21 .... 25
MINN. STAT. § 629.04 .... 20

**Other Authorities:**

Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac .... 5

Kyle Brown, *Bond Set at $2,000 for ICE Agent Charged in Nonfatal Shooting in Minneapolis*, KSTP (June 4, 2026), https://archive.is/IQG3G .... 3

Jeff Day et al., *Top Minnesota Lawmakers Are Subpoenaed in DOJ Investigation as Trump Praises Operation Metro Surge*, MINNEAPOLIS STAR TRIB. (Jan. 20, 2026), https://archive.is/z6dYn .... 3

Jose De Leon, III, *Prosecutor Asks Gov. Abbott to Sign Extradition Papers for RGV ICE Agent Facing Assault Charges in Minnesota*, KRGV (Aug. 3, 2026), https://archive.is/Sa7dJ .... 6

THE FEDERALIST No. 81 .... 11

Ernesto Londono et al., *Newly Obtained Video of Minneapolis Shooting Undermines ICE Account*, N.Y. TIMES (Apr. 6, 2026), https://archive.ph/SVSnz .... 4

Stefany Rosales, *Bail Ordered at $200K for Valley ICE Agent Wanted in Minnesota*, KRGV (June 4, 2026), https://archive.ph/C6SIW .... 4

Rebecca Santana & Mike Balsamo, *2,000 Federal Agents Sent to Minneapolis Area to Carry Out 'Largest Immigration Operation Ever,' ICE Says*, PBS NEWS (Jan. 6, 2026), https://archive.is/wqzuR .... 2

U.S. Dep't of Homeland Security, Press Release, *ICE Arrests Worst of the Worst Criminal Illegal Aliens During Operation Metro Surge in Minneapolis Including Pedophiles, Domestic Abusers, and Gang Members* (Dec. 4, 2025), https://archive.ph/8QBAF .... 3

U.S. Dep't of Homeland Security, Press Release, *MINNESOTA MADNESS: Governor Tim Walz Pardons Criminal Illegal Alien Convicted of Sexually Assaulting a 10-Year-Old Girl* (July 1, 2026), https://archive.is/074DI .... 28–29

WEBSTER'S NEW COLLEGIATE DICTIONARY (1949) .... 22

WYKC Channel 3, *Minneapolis Officials Release Video of Shooting by ICE Officer that Challenges DHS' Attack Claims*, YOUTUBE (Apr. 7, 2026), https://www.youtube.com/watch?v=IMOfjYSBe-E .... 3

## INTRODUCTION

The extradition power is singular in our constitutional order. It allows State A to exercise its sovereign power to restrain the liberty of an individual solely to facilitate the sovereign power of State B, whose criminal laws State A typically has no power to enforce. That is heady stuff. Unsurprisingly, the U.S. Supreme Court has long required considered judgment before wielding this awesome power. Among other limits, the Constitution's Extradition Clause says it applies only to "a Person . . . who shall flee from Justice, and be found in another State." U.S. CONST. art. IV, § 2, cl. 2. The ordinary meaning of a fugitive entails a volitional act of fleeing, not mere involuntary movement across state lines.

Any sane person would say that someone who commits a crime in Minneapolis, Minnesota, is thereafter forcibly abducted by being shoved into a van, and then driven to Chippewa Falls, Wisconsin, is not a fugitive who "fled" Minnesota. For that reason, Governor Abbott directed the Secretary of State—almost one month ago—to investigate whether Mr. Castro is a fugitive based on public reports and a preliminary investigation indicating he may have been *ordered* to return to Texas by ICE. While the Governor has serious doubts that Mr. Castro qualifies as a fugitive, the Governor has not yet received a report from the Secretary and so has not made a decision concerning Minnesota's request.

But Minnesota refuses to wait. It filed this lawsuit, despite the fact that its request has not been denied. Now it takes the remarkable position that a requesting State may unilaterally declare someone to be a fugitive and that no other actor—not even the Governor called upon to assist with extradition—may consider the real-world facts about how the individual concerned moved from the requesting State. The cell doors must stay closed based on bare, unproven say-so. Thankfully, that is not the law. For a century, the Supreme Court has

obligated the requestee Governor to "decide, upon such evidence as he may deem satisfactory," whether "the person demanded is a fugitive from the justice of the State the executive authority of which makes the demand." *Roberts v. Reilly*, 116 U.S. 80, 95 (1885). And he must do that "before he can lawfully comply with" the requisition demand—that is, before any mandatory or ministerial duty to extradite is triggered. *Ibid.*

Governor Abbott has routinely done this faithfully, as even Minnesota repeatedly concedes. But Minnesota suddenly takes issue with this one extradition application and refuses to accord Governor Abbott's deliberative process the presumption of regularity it is due. Given this odd rush to judgment, it is difficult to ignore the possibility that Governor Tim Walz is content to look the other way when the context is sexual violence against children by illegal aliens, but not when the context is immigration enforcement by federal officers.

At the end of the day, the context should not matter. The Constitution's extradition authority, together with the limits placed upon it, must apply evenhandedly, no matter who the putative defendant is or what he is alleged to have done. No State may short-circuit the Constitution's protections simply because it wants to claim its pound of flesh. The Court should deny emergency relief and, ultimately, dismiss this suit entirely.

## Background

In December 2025, the U.S. Department of Homeland Security (DHS) launched "Operation Metro Surge." In the wake of reports about rampant fraud by aliens in Minnesota, potentially implicating Governor Walz's office, DHS surged around 2,000 ICE agents to apprehend illegal aliens with outstanding deportation orders. Decl. ¶ 24.a–b (citing Rebecca Santana & Mike Balsamo, *2,000 Federal Agents Sent to Minneapolis Area to Carry Out 'Largest Immigration Operation Ever,' ICE Says*, PBS News (Jan. 6, 2026), https://archive.is/wqzuR).

ICE apprehended numerous "criminal illegal aliens, including child sex offenders, domestic abusers, and violent gang members." Decl. ¶ 24.c (citing U.S. Dep't of Homeland Security, Press Release, *ICE Arrests Worst of the Worst Criminal Illegal Aliens During Operation Metro Surge in Minneapolis Including Pedophiles, Domestic Abusers, and Gang Members* (Dec. 4, 2025), https://archive.ph/8QBAF). Governor Walz, meanwhile, criticized the operation as "political theater." Decl. ¶ 24.d (citing Jeff Day et al., *Top Minnesota Lawmakers Are Subpoenaed in DOJ Investigation as Trump Praises Operation Metro Surge*, MINNEAPOLIS STAR TRIB. (Jan. 20, 2026), https://archive.is/z6dYn).

Christian Castro is an ICE agent who was detailed to Minnesota as part of Operation Metro Surge. On January 14, 2026, he and three other agents attempted to apprehend Alfredo Aljorna, a Venezuelan alien who fled and led officers on a high-speed chase through Minneapolis. When the chase ended in Mr. Aljorna's front yard, he and his housemate (Julio C. Sosa-Celis) wrestled with Castro for less than a minute before the men fled into their home. Castro then fired a shot into the home, striking Mr. Sosa-Celis in the leg. Decl. ¶ 24.f (citing WYKC Channel 3, *Minneapolis Officials Release Video of Shooting by ICE Officer that Challenges DHS' Attack Claims*, YOUTUBE (Apr. 7, 2026), https://www.youtube.com/watch?v=IMOfjYSBe-E).

After the incident, Mr. Castro was found in Texas, where he was arrested on May 29, 2026, pursuant to a nationwide warrant issued by a Minnesota district court. Decl. ¶ 24.g. Reports indicated something curious about how he arrived here. According to his lawyer, Mr. Castro "was in the Rio Grande Valley as part of his job obligations" when he was apprehended. Decl. ¶ 24.i (citing Kyle Brown, *Bond Set at $2,000 for ICE Agent Charged in Nonfatal Shooting in Minneapolis*, KSTP (June 4, 2026), https://archive.is/IQG3G). In other

words, it appeared the federal government may have ordered the federal agent to leave Minnesota and return to his duty station in Texas. Decl. ¶ 24.j (citing Stefany Rosales, *Bail Ordered at $200K for Valley ICE Agent Wanted in Minnesota*, KRGV (June 4, 2026), https://archive.ph/C6SIW (Castro claiming he "was not a fugitive" and "was here in the area [Texas] pursuant to his job obligations")). Federal officials have indicated Mr. Castro is subject to an ongoing investigation and "could end up facing criminal charges" by the U.S. Department of Justice for his conduct on January 14th and for statements he made in the aftermath. Decl. ¶ 24.k (citing Ernesto Londono et al., *Newly Obtained Video of Minneapolis Shooting Undermines ICE Account*, N.Y. TIMES (Apr. 6, 2026), https://archive.ph/SVSnz).

Despite all this complexity surrounding the arrival in Texas, Governor Walz submitted a requisition on June 2, 2026, demanding Mr. Castro's extradition to face criminal charges in Minnesota. Over succeeding weeks, staff in the Office of the Governor (OOG) endeavored to investigate the facts of Mr. Castro's movement out of Minnesota to ascertain whether it was true that he "fled from the jurisdiction . . . and is now a fugitive," as Minnesota claimed. ECF No. 2-1 at 3. That is consistent with Governor Abbott's duty under the U.S. Constitution. As the Supreme Court observed more than a century ago, because the extradition power applies only to "a person . . . who shall flee" from one State to another, U.S. CONST. art. IV, § 2, cl. 2, "it must appear to the [requestee] governor, *before he can lawfully comply with the demand for extradition*, that the person demanded is substantially charged with a crime against the laws of the State from whose justice he is alleged to have fled . . . and *that the person demanded is a fugitive from the justice* of the State the executive authority of which makes the demand," *Hyatt v. Corkran*, 188 U.S. 691, 709 (1903) (emphases added).

While Texas officials endeavored to ensure the Constitution was complied with,

Minnesota personnel continued to pressure OOG's non-attorney staff to rush out an extradition warrant and to divulge the status of ongoing deliberations. Compl. ¶¶ 38, 42. Those deliberations, of course, are protected by various privileges, including the attorney-client and deliberative process privileges. That is why Minnesota was politely instructed "to direct its communications to" attorneys within OOG instead. Compl. ¶ 40. OOG's investigative process uncovered additional details about Mr. Castro's return to Texas and resulted in serious concerns about whether he qualified as a fugitive under the Constitution.

Accordingly, the Governor dutifully invoked statutory procedures designed for scenarios just like this. Section 4 of the Uniform Criminal Extradition Act (UCEA)—titled "GOVERNOR MAY INVESTIGATE CASE"—provides that "the Governor may call upon the Secretary of State, Attorney General or any prosecuting officer in this State to investigate or assist in investigating the demand, and to report to him . . . whether [the person] ought to be surrendered." TEX. CODE CRIM. PROC. art. 51.13, § 4. Almost one month ago, Governor Abbott directed the Secretary of State in a public letter "to investigate the demand and report to [the Governor] concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." Decl. ¶ 25 (citing Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac).

The Governor has not yet received the report from the Secretary of State. Decl. ¶ 26. And he has not yet denied (or approved) Governor Walz's requisition, as even Minnesota candidly admits. *See* Compl. ¶ 46. Even so, Minnesota rushed to file this lawsuit, claiming (incredibly) that an ICE agent subject to ongoing federal investigations—and who never bothered to post bond—was somehow a flight risk to Mexico because he "is fluent in

Spanish." Compl. ¶ 47. While Minnesota acknowledged that Governor Abbott's office "routinely" facilitates prompt extraditions to Minnesota consistent with Texas's duties under the Extradition Clause, Compl. ¶¶ 28–32, it nevertheless refused to consider the possibility that the "unusual and inconsistent" outcome here might be a function of Minnesota's own failure to ensure the Constitution was complied with when it simply declared him a "fugitive."

In what it stylizes as a "Temporary Restraining Order," Minnesota asks this Court to forcibly order that Mr. Castro be extradited to Minnesota or be restrained in his liberty longer than statutes allow. Mr. Castro continues to maintain that he "was not a fugitive," that "he was still employed," and that "he was here in the area pursuant to his job obligations" for ICE. Jose De Leon, III, *Prosecutor Asks Gov. Abbott to Sign Extradition Papers for RGV ICE Agent Facing Assault Charges in Minnesota*, KRGV (Aug. 3, 2026), https://archive.is/Sa7dJ.

## SUMMARY OF THE ARGUMENT

The practical effect of the relief sought controls the governing legal standard, rather than the label a party chooses to place on its motion. *Sampson v. Murray*, 415 U.S. 61, 85–86 (1974); *see Cummings v. Missouri*, 71 U.S. 277, 325 (1867) ("The Constitution deals with substance, not shadows."). Thus, Minnesota's framing of its application as seeking issuance of a TRO does not change that it really seeks a mandatory preliminary injunction. A TRO preserves the status quo by temporarily restraining threatened conduct. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). "A mandatory preliminary injunction," meanwhile, "seeks to alter the status quo prior to litigation rather than maintain it." *Texas v. Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018).

The showings required to obtain either kind of preliminary relief are the same.

Accordingly, to prevail, Minnesota must prove (1) that is substantially likely to succeed on the merits, (2) that it faces a substantial threat of irreparable harm if the injunction is not issued, (3) that the balance of the equities favors relief, and (4) that the public interest likewise favors an injunction. *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023). Mandatory injunctive relief, however, "is particularly disfavored," *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976), and should only be granted in "rare cases," *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958). Minnesota's choice to seek such relief thus requires it to "show a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 (5th Cir. 1990). It cannot do so.

First, numerous justiciability hurdles—from ripeness to sovereign immunity to limits on mandamus—deprive this Court of jurisdiction at the outset. Second, on the merits, Minnesota's effort to rush the Governor's deliberations and unilaterally deem Mr. Castro to be a fugitive conflict with a century of Supreme Court precedent and the plain meaning of the Extradition Clause. Third, the "harms" Minnesota complains of do not justify disrupting the Governor's ongoing deliberations where an extradition warrant may still issue after release.

## ARGUMENT

### I. Because Minnesota's Extraordinary Request Fails at the Threshold, this Court Lacks Authority to Grant Relief.

Before exercising coercive power over a defendant, a court must assure itself that it has jurisdiction. *Steel Co. v. Citizens for a Better Enviro.*, 523 U.S. 83, 94–95 (1998). Jurisdiction does not exist here. This dispute over an extradition request that has never been denied is not yet ripe. The Governor is immune from suit—and *Ex parte Young* provides no workaround—where he is endeavoring to fulfill, rather than evade, federal law. Federal courts lack authority to issue writs of mandamus to effectively commandeer state officials. And a proper reading

of federal law shows that a case like this must be filed in the U.S. Supreme Court. These justiciability defects are grounds not only to deny the emergency relief that Minnesota seeks, but also to dismiss this suit out of hand. Granting relief over these objections would also ground an immediate appeal, regardless of how Minnesota has stylized its request.

### A. This effort to short-circuit Governor Abbott's deliberations—before a denial has even issued—is not ripe.

Ripeness, like standing, is an absolute prerequisite to exercising subject matter jurisdiction because both doctrines "'originate' from the same Article III limitation." *Susan B. Anthony's List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). Minnesota's claim is not ripe because Governor Abbott has not refused its extradition demand. He has not made a final decision at all. Texas law permits him, upon receiving a demand from another State, to order others in the Executive Department to investigate the demand and report "whether [an individual] ought to be surrendered." TEX. CODE CRIM. PROC. art. 51.13, § 4. Governor Abbott exercised that authority almost one month ago and is awaiting the Secretary's report.

That alone should dispose of Plaintiff's request for preliminary relief. The ripeness doctrine prevents federal courts from deciding disputes that are "premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). Although ripeness, like other justiciability doctrines, is derived from the limits placed by Article III of the United States Constitution on the power of federal court, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), it is also drawn from "prudential reasons for refusing to exercise discretion," *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003). A case is not ripe "if further factual development is required," *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987), or "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas v. United States*, 523 U.S. 296, 300 (1998).

Minnesota's theory necessarily depends upon the presupposition of a future event: that Governor Abbott will deny its demand. Once the Secretary of State concludes his investigation, the Governor may conclude that the statutory requirements for extradition are satisfied, or he may conclude that they are not. Either way, Governor Abbott is entitled to see that deliberative process through and is entitled to the presumption of regularity afforded to government acts. *See United States v. Chem. Found.*, 272 U.S. 1, 14 (1926). But until that process produces a decision, there is no gubernatorial refusal to review, nor any injury for it to remedy.

The Supreme Court case Minnesota harps on—*Puerto Rico v. Branstad*, 483 U.S. 219 (1987)—proves the point. There, the Governor of Puerto Rico requested the Governor of Iowa to extradite a man who had been arrested and charged with homicide in Puerto Rico, but who fled after being arraigned. *Id.* at 221. Despite stipulating "that the extradition papers fully complied with" all legal requirements, Iowa Governor Robert Ray "formally notified the Governor of Puerto Rico that . . . the request for extradition was denied" more than seven months after the request was made. *Id.* at 222–223. A model of patience, Puerto Rico then renewed its request to "to Governor Ray's successor in office, Respondent Terry Brandstad" and was denied again. *Id.* at 222. It was only after these (repeated) denials, despite stipulations that all prerequisites were met, that Puerto Rico sought and obtained relief in federal court.

Minnesota cannot absolve its own refusal to wait by pointing to Mr. Castro's possible release from preliminary detention. If Minnesota has any "constitutional and statutory rights" at all, Compl. ¶ 7,[1] it is only a right to have *proven* "fugitives" delivered "upon proper

[1] The better view is that States do not possess "rights" like private individuals. That is why States cannot invoke the benefits of the Fifth Amendment, *South Carolina v. Katzenbach*, 383 U.S. 301, 323–324 (1966), and are not "persons" eligible to invoke the cause of action in 42 U.S.C. § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). As sovereigns, States have only *powers*—against which rights operate as privations—that may often be vindicated

demand," *Branstad*, 483 U.S. at 226. It is not entitled to insist that a requestee Governor unthinkingly accept Minnesota's characterization or render a decision on the propriety of its demand within a set period of time. The UCEA nowhere prescribes a time limit for the requestee Governor to decide whether the Constitution's predicates have been met. *Infra* Part II.B. Nor do the Act's detention provisions limit the Governor by implication. Both speak to courts, not to Governors. One requires "the judge or magistrate" to detain an individual for thirty days. TEX. CODE CRIM. PROC. art. 51.13, § 15. The other allows "a judge or magistrate" to extend that detention for an additional period of up to 60 days. *Id.* art. 51.13, § 17. Precisely because this 90-day period does not restrict their authority, Governors can—and do—issue extradition warrants more than 90 days after an individual's arrest. *Infra* Part III.A.

Whether Mr. Castro is a fugitive who triggers any mandatory extradition obligation is the very question Governor Abbott is endeavoring to determine. Minnesota may be frustrated about how long that process has taken. But it may not establish the necessary predicate facts by mere *ipse dixit*. Nor may it convert federal courts into roving supervisors of state executives endeavoring to dutifully ensure compliance with the Constitution. Minnesota may be content to rush out extradition warrants, heedless of whether the Constitution's prerequisites have been met, all while trusting to chance that the individuals concerned will not challenge those determinations via petitions for a writ of *habeas corpus*. But the Governor of Texas is not content with that slipshod approach to the constitutional rights of American citizens. This case is not ripe, and the Court should decline to award speculative preliminary relief.

### B. Sovereign immunity bars this suit against the Governor of Texas for his efforts to comply with the Extradition Clause.

---

through diplomatic means or mediated as a last resort in our highest court. *Colorado v. Kansas*, 320 U.S. 383, 392 (1943) (eschewing "adjudicatory power" for interstate disputes).

Minnesota has sued Governor Abbott "in his official capacity." Compl. ¶ 14. The Governor, as Chief Executive Officer of the State of Texas, is immune from suit in federal court twice over. As a matter of federal law, the Governor is entitled to both structural immunity and what is properly called Eleventh Amendment immunity. *See PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 509–511 (2021) (Gorsuch, J., dissenting).

To be sure, the constituent members of the Union may have consented to forgo their immunities from suit in disputes with one another, but they did so on the express condition that such cases would "be determined in the highest, rather than in a subordinate judicial tribunal of the nation." *United States v. Texas*, 143 U.S. 621, 643 (1892). The States, in other words, "agreed, in the Constitution" to forgo immunity from suit in interstate disputes, subject to the Supreme Court—the one tribunal "with authority to speak for all the people and all the States"—"exercis[ing] original jurisdiction in all such cases." *Id.* at 645–646; *see also Principality of Monaco v. Mississippi*, 292 U.S. 313, 328–329 (1934) (States "waived their exemption from judicial power" based on the Supreme Court being established as "a permanent tribunal with adequate authority to determine controversies between the States").

If Minnesota wishes to rely on Texas's consent to be sued pursuant to the plan of the constitutional convention, then it must honor *the terms* of such consent by suing in the Supreme Court. *See Texas*, 143 U.S. at 639–640 (collecting examples and noting they "were all original suits, in this court"); THE FEDERALIST No. 81 (Alexander Hamilton). It has not done so. Instead, Minnesota elected to sue in federal district court. Accordingly, because Texas never consented to being sued by another sovereign government in federal district court, Minnesota must find a way around Texas's sovereign immunity. It cannot do so.

Minnesota may try invoking *Ex parte Young*, 209 U.S. 123 (1908). That will not work.

First, *Ex parte Young* is "a narrow exception" to sovereign immunity rooted in federal preemption. *Whole Women's Health v. Jackson*, 595 U.S. 30, 39 (2021). The logic of the doctrine runs like this: State laws that conflict with federal law are preempted and unenforceable under the Supremacy Clause. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing U.S. CONST. art. VI, cl. 2). When such a conflict arises, a "void" state law thus provides no lawful authority to act. *Ex parte Young*, 209 U.S. at 159. Therefore, a state official who endeavors to implement that void state law performs "an illegal act" that "strip[s]" him "of his official or representative character." *Id.* at 159–160; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("The theory of [*Ex parte Young*] was that an unconstitutional enactment is 'void.' ").

Minnesota nowhere argues that Governor Abbott is implementing a void state law that somehow conflicts with federal law. Far from it. In some instances, Minnesota even urges this Court to order Governor Abbott to comply with Minnesota's (mistaken) view of *Texas* law. *See* Compl. ¶¶ 22–27, 60–64; TRO Brief at 13–15. That is plainly prohibited by Supreme Court precedent. *Pennhurst*, 465 U.S. at 106. Governor Abbott, for his part, seeks to comply with federal and state law by assessing whether there is "direct and positive proof" of the facts necessary to exercise Extradition Clause power here. *Roberts*, 116 U.S. at 97. If Mr. Castro is not a fugitive, the Governor does not have a ministerial duty to do what Minnesota wants. *Hyatt*, 188 U.S. at 709; *infra* Part II.C.

Second, besides being triggered only by a particular legal violation not at issue here (preemption of state law), *Ex parte Young* also authorized only a particular kind of remedy that Minnesota does not seek (a prohibitory injunction). By acting *ultra vires*, so the *Ex parte Young* theory goes, a state official may lose his official status with respect to that act and can be ordered to stop. 209 U.S. at 158–160. But ordering him to take "affirmative" action *intra*

*vires* is premised on the idea that he *retains* his "official or representative character." *Id.* at 160. Accordingly, "a suit may fail" if a party requests relief that "cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). In other words, *Ex parte Young* allows only a prohibitory injunction, but not a mandatory injunction ordering a state official to take official action.

Minnesota seeks exactly what *Ex parte Young* and *Larson* prohibit. Rather than trying to strip Governor Abbott of his official character, it seeks to compel him to undertake official action in his capacity as Governor. In its complaint, Minnesota prays this court to "[i]ssue a writ of mandamus to compel Defendant Governor Abbott to issue forthwith a governor's rendition warrant commanding that Defendant Sheriff Trevino and the Cameron County Sheriff's Office deliver Christian Castro to a duly authorized agent of the State of Minnesota for extradition." ECF No. 2 at 18. In its application for emergency relief, Minnesota asks this Court "to order Defendant Texas Governor Greg Abbott to immediately execute his mandatory ministerial duty to issue a rendition warrant to extradite Christian Castro from Texas to the [sic] Minnesota." ECF No. 8 at 1. And in its proposed order, Minnesota would have this Court order that "Defendant Texas Governor Greg Abbott is ORDERED to execute a rendition warrant for Christian Castro's extradition forthwith." ECF No. 8-12 at 2. Because none of that is permitted, Governor Abbott remains immune from this suit in its entirety.

### C. Nothing authorizes Minnesota to conscript federal courts into issuing writs of mandamus to state officers here.

Even if this Court could overlook the fact that this suit is not ripe and that Governor Abbott is immune from suit, Minnesota still cannot show that this Court has power to award the emergency relief it seeks. In its complaint, Minnesota prays for "a writ of mandamus to

compel" Governor Abbott to issue an extradition warrant. Its emergency motion likewise seeks mandamus relief, given that it moves for relief ordering Governor Abbott "to immediately execute his mandatory ministerial duty" to issue a warrant extraditing Mr. Castro. Minnesota has a problem: "Federal courts have no power to issue writs of mandamus to direct state officials in the performance of their duties." *Peters v. Davis*, No. CV H-18-3204, 2019 WL 127076, at *1 (S.D. Tex. Jan. 7, 2019) (Rosenthal, C.J.).

In 1938, when Federal Rules of Civil Procedure were first adopted, mandamus relief was expressly stripped from federal district courts. To this day, the Civil Rules continue to say that "[t]he writs of scire facias and mandamus are abolished." FED. R. CIV. P. 81(b). In 1962, Congress expressly conferred upon federal district courts a dose of mandamus authority, but only with respect to *federal* officers. Federal statutes now provide that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added). Accordingly, "Texas officials or employees are not subject to the mandamus power of a federal district court." *United Sovereign Americans, Inc. v. Nelson*, 762 F. Supp. 3d 523, 527 (N.D. Tex. 2025).

Minnesota points to no other source of law that can provide what is lacking. The only bases of jurisdiction cited in the complaint are 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Compl. ¶ 10. The former countenances "all civil actions arising under the Constitution, laws, or treaties of the United States." The latter refers to supplemental jurisdiction over related claims "in any civil action" of which the district court already has original jurisdiction. A petition for a writ of mandamus, however, is not a "civil action" within the meaning of these two primary jurisdictional statutes. That is why, as noted above, mandamus is referenced under a

different section that Minnesota never cites and which concerns a distinct "action in the nature of mandamus" cabined only to federal officers. *See also U.S. ex rel. Knapp v. Lake Shore & M.S.R. Co.*, 197 U.S. 536, 541 (1905) (providing that mandamus authority "cannot be inferred from the grant of authority" to enforce federal law).

Nor can Minnesota seek shelter in the All Writs Act. That statute authorizes federal courts to issue writs "in aid of their respective jurisdictions," but requires that jurisdiction first be established in some other way. 28 U.S.C. § 1651(b). As with a declaratory judgment, a court may issue appropriate mandamus relief if it has an independent basis of jurisdiction, *see, e.g.*, *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–260 (1957), but it may not entertain an original proceeding for a writ of mandamus as the vehicle for litigation. In other words, mandamus is "confined exclusively" and may issue only when "necessary to the exercise of" some other source of jurisdiction. *McIntyre v. Wood*, 7 Cranch (11 U.S.) 504, 506 (1813); *cf. Moye v. Clerk, DeKalb County Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973) (per curiam).

*Puerto Rico v. Branstad*, 483 U.S. 219, (1987), is not to the contrary. That decision held only that *Kentucky v. Dennison*, 24 How. (65 U.S.) 66 (1861), was overruled in a context where the requestee State "stipulated before the district court that the extradition papers fully complied with the requirements" for extradition—including that the individual concerned was a fugitive—but nevertheless refused to extradite. *Branstad*, 483 U.S. at 223. In light of that stipulation, the Iowa Governor had a "ministerial duty." *Id.* at 228. The Court never held that federal courts may claim for themselves a requestee State Governor's solemn "responsibility of determining . . . whether the individual is a fugitive" in the first place based on "competent proof." *Ex parte Reggel*, 114 U.S. 642, 651–652 (1885). Nor did it address the antecedent question of whether Congress gave district courts power to issue writs of mandamus against

state officials, as no party raised it. Such "drive-by" jurisdictional rulings, like implicit acquiescence in broad equitable relief, "have no precedential effect." *Steel Co.*, 523 U.S. at 91; *Trump v. CASA, Inc.*, 606 U.S. 831, 845 n.7 (2025).

Quite apart from whether Congress *could* authorize federal courts to issue mandamus relief to state officials consistent with the Constitution, it has never done so as a matter of statutory law. Accordingly, this "court lacks jurisdiction to entertain [Minnesota's] request for mandamus relief." *Peters*, 2019 WL 127076, at *1.

### D. The Supreme Court of the United States is the only appropriate venue for this dispute between two States.

Finally, to the extent this sort of suit can be brought at all, it must be brought in the U.S. Supreme Court. The Constitution gives that Court original jurisdiction over suits between two States. U.S. CONST. art. III, § 2, cls. 1–2. Federal law makes that jurisdiction "original and *exclusive*." 28 U.S.C. § 1251(a) (emphasis added); *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992). The plaintiff in this case is "the State of Minnesota." Compl. ¶ 13. And it has sued the Governor of Texas in his official capacity, Compl. ¶ 14, who "represents the State" in litigation "where the State is a party, plaintiff or defendant." *Dennison*, 65 U.S. at 98. "Such exclusive jurisdiction was given to [the Supreme Court], because it best comported with the dignity of a State, that a case in which it was a party should be determined in the highest, rather than in a subordinate judicial tribunal of the nation." *Texas*, 143 U.S. at 643.

The Supreme Court, to be sure, has said it has discretion to decline review of such disputes. *See, e.g.*, *Branstad*, 483 U.S. at 223 n.1. But that view is wrong, as numerous Justices have explained in recent years. *See, e.g.*, *California v. West Virginia*, 454 U.S. 1027 (1981) (Stevens, J., dissenting from denial of motion for leave to file bill of complaint); *Louisiana v. Mississippi*, 488 U.S. 990 (1988) (White, J., dissenting from denial of motion for leave to file

bill of complaint); *Texas v. California*, 141 S. Ct. 1469 (2021) (Alito, J., dissenting from denial of motion for leave to file bill of complaint); *Alabama v. California*, 145 S. Ct. 757 (2025) (Thomas, J., dissenting from denial of motion for leave to file bill of complaint). According to Chief Justice Marshall, the Supreme Court has "no . . . right to decline the exercise of jurisdiction which is given" and doing so "would be treason to the constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). Governor Abbott preserves this argument should the Supreme Court see fit to revisit it. *See J.W. v. Paley*, 81 F.4th 440, 448 n.21 (5th Cir. 2023).

## II. Minnesota Is Not Likely to Succeed on the Merits.

On the merits, Minnesota's arguments are doomed to fail. Across its pleadings, Minnesota hangs its hopes on one endlessly repeated refrain—*i.e.*, that Governor Abbott has "ministerial" duty to extradite Mr. Castro (and anyone else) on Minnesota's mere say-so. That is not the law. The Supreme Court has said the opposite. Especially when he is aware of evidence suggesting an individual may not be a fugitive within the meaning of the Constitution, a Governor has a solemn responsibility to determine for himself by factual proof whether the individual is subject to the Extradition Clause. Given that the text of the Constitution, Supreme Court precedent, and common sense all suggest that the act of fleeing requires a volitional departure from one State to another, preliminary evidence here suggests that Mr. Castro may not be a fugitive at all.

### A. Governor Abbott has a solemn obligation to determine whether all predicates are met to trigger the extradition power.

The Extradition Clause "has never been considered to be self-executing." *California v. Superior Ct. of Calif.*, 482 U.S. 400, 406 (1987). Congress adopted the Federal Extradition Act, 18 U.S.C. § 3182, to give effect to the Extradition Clause, and all but a few States adopted the UCEA to supplement it with procedural rules for extraditions. *Michigan v. Doran*, 439 U.S.

282, 288–289 (1978). In doing so, both Congress and the States intended extradition "to be a summary procedure" and for "extradition proceedings[] 'to be kept within narrow bounds.'" *California*, 482 U.S. at 407 (quoting *Biddinger v. Comm'r of Police,* 245 U.S. 128, 135 (1917)).

So, Minnesota is right that "[t]he Extradition Clause of the United States Constitution 'creates a mandatory duty to deliver up fugitives upon a proper demand.'" TRO Brief at 10 (quoting *Branstad*, 483 U.S. at 227); Compl. ¶ 16 (same). But Minnesota unknowingly makes the case for the Governor's position in the very language it quotes from *Branstad*. Governor Abbott is entitled and obligated to determine whether Mr. Castro is a "fugitive" and thus whether Minnesota's demand is "proper" at all. More than 100 years of Supreme Court precedent establishes that "certain facts"—including whether the individual is a fugitive—"must appear before the governor has the right to issue his warrant." *Hyatt*, 188 U.S. at 709.

Accordingly, Supreme Court cases on the Extradition Clause predictably fall into one of two buckets. On the one hand are cases that concern a requestee Governor's threshold determination about *whether* an individual is, in fact, a fugitive thus triggering the extradition obligation in the first instance. In some cases, the Supreme Court found that this prerequisite was met. *See, e.g.*, *Appleyard v. Massachusetts*, 203 U.S. 222, 226–227 (1906); *Bassing v. Cady*, 208 U.S. 386, 392 (1908). In others the Court found it was not. *See, e.g.*, *Hyatt*, 188 U.S. at 719. In still others, the Court suggested reasonable minds could disagree. *See, e.g.*, *Reggel*, 114 U.S. at 653. But one thing is common across all of these cases: The requestee Governor was authorized and duty-bound—"before he can lawfully comply with" the requisition demand—to make *his own* determination "that the person demanded is a fugitive from the justice" of the requesting State based on "direct and positive proof." *Roberts*, 116 U.S. at 95, 97.

On the other hand are cases where the extradition obligation *was* triggered, but the

requestee State nevertheless refused extradition based on its own view of whether the individual should be punished. States, in these cases, impermissibly sought to: litigate for themselves the individual's likely guilt or innocence, *Pierce v. Creecy*, 210 U.S. 387, 403–405 (1908); question a sister State's authority to criminalize certain conduct, *Dennison*, 65 U.S. at 68–69; or cast aspersions on the quality of judicial proceedings in another State, *Branstad*, 483 U.S. at 222. Across all these cases, it is clear that the requesting State's documents "are clothed with the traditional presumption of regularity." *Doran*, 439 U.S. at 289–290.

Governor Abbott has never claimed that second-degree assault or falsely reporting a crime in Minnesota are not qualifying offenses, that Mr. Castro should not be punished for any such criminal conduct, or that Minnesota courts are somehow inadequate to test Mr. Castro's guilt or innocence. It may be that Mr. Castro violated Minnesota's criminal laws. It may be, as well, that he should face federal criminal charges. But none of that is the question at hand. Instead, Governor Abbott is fulfilling his threshold "responsibility" under the Constitution to determine "by competent proof" whether "the accused is, in fact, a fugitive" after "opposing evidence was brought to his attention." *Reggel*, 114 U.S. at 652–653.

**B. The obligation to determine predicate facts is not ministerial, as evidenced by a century of practice and precedent.**

Because Governor Abbott is assessing "a condition precedent" to the extradition obligation being triggered in the first place, *Reggel*, 114 U.S. at 652, it should be obvious that any "mandatory" and "ministerial" duty to extradite has not sprung into being, *Mississippi v. Johnson*, 71 U.S. 475, 498 (1866). But if common sense is not enough, numerous other indicators establish that this task is not a mere checking of boxes by Minnesota.

Consider, for example, the numerous Supreme Court statements describing the need for "evidence" and "positive proof" to demonstrate fugitive status. *See, e.g.*, *Hyatt*, 188 U.S. at

710; *Roberts*, 116 U.S. at 97; *Appleyard*, 203 U.S. at 226. Sometimes this evidence was taken on the papers, including by affidavit. Other times it may have been gathered in live testimony in extradition hearings before a Governor's office. Or facts may be gathered by another agency within the executive branch. Because "the statute . . . does not prescribe the character of such proof" needed to establish fugitive status, *Reggel*, 114 U.S. at 651, the Governor has some flexibility in determining how to receive "such evidence as he might deem satisfactory" to discharge his constitutional obligations, *Hyatt*, 188 U.S. at 710.

That is why state law expressly creates a mechanism for the Governor to investigate certain facts as a predicate to any extradition obligation. As explained above, in light of public evidence suggesting that Mr. Castro was ordered by the federal government to leave Minnesota and return to Texas, Governor Abbott has called upon the Texas Secretary of State pursuant to Article 51.13, Section 4 of the Texas Code of Criminal Procedure to investigate whether Mr. Castro is a fugitive. Both Governor Walz and Attorney General Ellison should find this statutory tool familiar. After all, Minnesota law contains a nearly identical provision, authorizing Governor Walz to "call upon the attorney general" to investigate a requisition demand and to report on "whether the person ought to be surrendered." MINN. STAT. § 629.04. If a requestee Governor's duty was purely ministerial, with no room for independent judgment, these provisions would make little sense.

Another indicator that this process is not a mere trifle is the fact that its output grounds real legal consequences in later disputes. After a Governor issues an extradition warrant, four issues may be impeached in a petition for a writ of *habeas corpus* by the defendant: (a) whether the extradition documents on their face are in order; (b) whether the defendant has been charged with a crime in the demanding State; (c) whether the defendant is the person named

in the request for extradition; and (d) whether the defendant is a fugitive. *Doran*, 439 U.S. at 289; *Alabama ex rel. Governor & Atty. Gen. v. Engler*, 85 F.3d 1205, 1208 (6th Cir. 1996).

But "[i]f it be determined that the alleged criminal is a fugitive from justice, whether such determination be based upon the requisition and accompanying papers in proper form, or after an original, independent inquiry into the facts, and if a warrant of arrest is issued after such determination, the warrant will be regarded as making a *prima facie* case in favor of the demanding state, and as requiring the removal of the alleged criminal to the state in which he stands charged with crime, unless, in some appropriate proceeding, it is made to appear that he is not a fugitive from the justice of the demanding state." *People ex rel. McNichols v. Pease*, 207 U.S. 100, 109 (1907). A requestee Governor's determination creates a "rebuttable presumption" in subsequent proceedings. *Doran*, 439 U.S. at 293 n.3 (Blackmun, J., concurring in result). That determination is treated as an event of legal significance precisely because it is not just a rubber stamp of whatever the requesting State sent over.

These are not perfunctory tasks. The Governor has a duty to protect the rights of Texans by ensuring the "essential elements" of the UCEA are "strictly followed." *U.S. ex rel. McCline v. Meyerling*, 75 F.2d 716, 717 (7th Cir. 1934). "Only by faithfully following the provisions of this statute may a person be lawfully deprived of his liberty and extradited from an asylum state to another state, there to be tried for the commission of a crime." *Ibid*.

### C. Preliminary public evidence suggests that Mr. Castro is not a fugitive within the meaning of the Constitution.

Because Minnesota rushed to bring this suit while Governor Abbott continues to investigate the circumstances surrounding Mr. Castro's movement, any analysis is necessarily preliminary. But public evidence, and a preliminary investigation, suggest that Mr. Castro may not be a qualifying fugitive within the meaning of the Extradition Clause.

Start with the Constitution's text. Article IV, Section 2, Clause 2 says that the extradition authority applies only to "[a] Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State." A couple takeaways jump off the page immediately. For one thing, it is insufficient that the individual concerned is "found in another State" after having been in the State where the crime was allegedly committed. That's because the conjunctive structure around the word "and" points to two, distinct requirements. *See, e.g.*, *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) ("The requirements are connected by the conjunctive 'and,' meaning defendants must meet all three."). The individual must be found elsewhere *and* he must have fled there.

So, the phrase "who shall flee from Justice" must carry its own meaning. One aspect of that meaning inheres in the verb the framer's chose to employ. To "flee" necessarily requires an act of volition, not involuntary movement. *See Flee*, WEBSTER'S NEW COLLEGIATE DICTIONARY 316 (1949) ("To run away or escape from"); *Fugitive*, WEBSTER'S NEW COLLEGIATE DICTIONARY 335 (1949) ("One who flees from pursuit, danger, service, etc."). That is why it makes little sense to say of someone: "He accidentally fled from the crowd's watchful gaze." *Cf. Voisine v. United States*, 579 U.S. 686, 692–693 (2016) (holding the meaning of the phrase "use of force" "must be volitional; an involuntary motion, even a powerful one, is not naturally described as an active employment of force").

Analogous criminal laws provide helpful guidance, too. Congress has made it a federal crime to do that which triggers the Extradition Clause: "Whoever moves or travels in interstate or foreign commerce with intent . . . to avoid prosecution . . . under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the laws of the place from which the fugitive flees, . . . shall be

fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1073. Not long after its enactment, the Supreme Court read this law as penalizing "*voluntary* flight" by a defendant who "*elected* to flee." *Michel v. Louisiana*, 350 U.S. 91, 98–99 (1955) (emphases added); *see also United States v. Frank*, 864 F.2d 992, 1006 (3d Cir. 1988) ("To prove such a violation the government must prove that the defendant willfully moved or traveled in interstate or foreign commerce with the intent to avoid a state prosecution."). It would be odd if involuntary movement across state lines could make one liable for a federal felony.

To be sure, the Supreme Court has read the Extradition Clause's "who shall flee" phrase broadly in other respects. For example, it is not necessary that the individual should have been charged before he flees. *See Roberts*, 116 U.S. at 97. It suffices that he flees after the underlying criminal episode, regardless of when he is ultimately "charged" with a crime. Likewise, the Supreme Court has said it does not matter whether the individual's purpose in fleeing was to evade criminal liability. *See Bassing*, 208 U.S. at 392. Whether he fled to avoid the constable or to visit an ailing relative, the fugitive made a voluntary decision to depart while knowing he still had business with a sovereign government whose laws he flouted.

Even so, across numerous cases, the Supreme Court continually recognized the need for the act of flight to be volitional, even if the reasons motivating that act were less important. In *Appleyard*, for example, the Court stressed that the individual must "'withdraw[] himself from such jurisdiction without waiting to abide the consequences of such act'" in order to be considered a fugitive. 203 U.S. at 231 (quoting *In re Voorhees*, 32 N.J.L. 141, 150 (1867)). It should not suffice that he be withdrawn by someone else. So, too, in *Hyatt*, the Court stressed the "plain meaning" of fleeing and quoted the Extradition Act's repeated emphasis on the volitional act of flight. 188 U.S. at 712–713 (noting focus on the State "*to which such person has*

*fled*" and the State "*from whence the person so charged has fled*" (emphases original)). "It is difficult to see how a person can be said to have fled from the State," the Court observed, "when in fact he was not within the State at the time the act is said to have been committed." *Id.* at 713.

It is likewise difficult to see how a federal officer can be said to have fled from one State when he is ordered by the federal government to return to his official duty station in another. Flight by a fugitive requires a volitional act by the individual, not an act forced upon him by a sovereign government.

Although the Governor is still awaiting a formal report from the Secretary of State, a preliminary investigation indicated that Mr. Castro was, in fact, ordered by DHS to return to his duty station in Texas. Needless to say, it would present a constitutional problem of a different magnitude if a State could create *additional* liability for a federal officer who moved from one State to another because he was ordered to do so by the federal government. Intergovernmental immunity, to be sure, is not unlimited. *See Texas v. DHS*, 123 F.4th 186, 205–209 (5th Cir. 2024) (holding federal immigration agents had no intergovernmental immunity from state tort liability for wanton destruction of state property to facilitate illegal immigration). But it may provide one more reason to hesitate before approving a State to declare federal officers to be "fugitives" simply for complying with federal orders.

On a preliminary view, it appears that Mr. Castro is in Texas on the orders of the federal government. As the Governor's investigation is ongoing, he cannot divulge the details of ongoing deliberations. But that investigative process, expressly provided for in the UCEA, is entitled to a presumption of regularity until the Governor sees it through to completion. That is especially so given Minnesota's own admission that Governor Abbott routinely discharges his responsibilities under the Extradition Clause faithfully.

## III. The Remaining Factors Counsel in Favor of Denying Emergency Relief.

Minnesota not only fails to show a likelihood of success on the merits, but it also fails to establish any other element necessary to support an award of emergency relief. Minnesota cannot show irreparable harm because the release of Mr. Castro, whether on bail or after passage of the 90-day statutory period, has no effect on the Governor's ability to issue a warrant to extradite Mr. Castro. Minnesota's claim that Mr. Castro, who never fled in the months before he was charged and has never posted bail, now suddenly poses a flight risk because he speaks Spanish borders on the absurd. In the end, Minnesota's zeal to see Mr. Castro prosecuted on its home turf cannot justify pretermitting Governor Abbott's ongoing deliberations pursuant to the Constitution and state statutes, which are designed to protect against abusive and baseless deprivations of individual liberty.

### A. Because Governor Abbot may issue a warrant more than 90 days after Mr. Castro's arrest, Minnesota faces no irreparable harm.

Minnesota's claim of irreparable harm rests on the false premise that if Mr. Castro is released when the period of preliminary detention expires, Minnesota will lose its opportunity to obtain his extradition. The UCEA says otherwise. The ninety-day period limits pre-warrant detention; it does not impose a ninety-day deadline on the Governor to approve or deny the demanding State's request. *Application of Simpson*, 586 P.2d 1389, 1390 (Kan. Ct. App. 1978) (collecting cases). Minnesota's extradition rights thus do not disappear merely because Mr. Castro is no longer subject to preliminary custody. *Ibid*. The warrant, when issued, carries the same legal authority whether issued before or after the ninety-day period. Once issued, it remains effective for one year, subject to the Governor's statutory authority to recall or reissue it. TEX. CODE CRIM. PROC. art. 51.13, § 21.

Texas can, and has, issued warrants more than 90 days after arrest, for example when

the requesting State's paperwork was deficient or incomplete. The Governor has done so three times just this year alone—including warrants issued to Oklahoma (for Benjamin Arrellanos-Romer), Colorado (for Darin Dingman), and Alabama (for Genaro Junior Varela). Decl. ¶ 19. That is not unusual, the Governor likewise issued warrants more than 90 days after arrest in 2025 in response to requisitions from Kansas (for Melissa Ann Martinez), Oklahoma (for Kevin Clark Boren), and Idaho (for Anita Silvaz). Decl. ¶ 20. If he deems it appropriate here, the Governor may likewise issue an extradition warrant for Mr. Castro at a later date.

Minnesota cannot identify an irreparable injury arising from expiration of preliminary detention. Mr. Castro's possible release is not a consequence unique to the Governor's failure to issue an extradition warrant. Mr. Castro's release could occur at any time because the UCEA permits an accused person, with limited exceptions, to obtain release on bail pending issuance of the Governor's warrant. TEX. CODE CRIM. PROC. art. 51.13, § 16. Mr. Castro, in fact, was allowed bail set at $200,000. For reasons that are unclear, he has not chosen to post it. But he could do so tomorrow. Once again, Minnesota should understand this. In 2022 and 2025, Texas submitted requisition demands to Minnesota for Texas fugitives—Florinda Cerbantez and Danzel Trayveon Jones—who bonded out before Minnesota issued an extradition warrant. Decl. ¶ 21. Those bond postings in no way prevented Governor Walz from finding the prerequisites for extradition had been met and issuing a warrant. The fact that Mr. Castro may also be released because of statutory limits on preliminary detention, in addition to posting bond, does not inflict an irreparable injury on Minnesota.

Alternatively, Minnesota speculates that Mr. Castro will flee to Mexico if released. That claim, based on Mr. Castro's fluency in Spanish and contact with a woman in Mexico, is unsupported by verified evidence. ECF No. 2 at ¶ 47. It is the *only* allegation in Minnesota's

complaint made "[o]n information and belief." *Ibid*. That is insufficient. Minnesota must show that irreparable injury is likely, not merely possible. *Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 22 (2008). And the Fifth Circuit has counseled district courts to be reluctant to award preliminary relief based on allegations made on information, not on substantiated facts. *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971).

Even assuming the Court were to give such unsubstantiated claims any weight, they are still insufficient to show harm. If it suffices to establish a likelihood of flight and justify continued detention that a defendant lives near the border, speaks Spanish, and knows somebody in Mexico, then almost every person in this Court's division would be a flight risk. Only out-of-state lawyers unfamiliar with the Valley could dream up something so silly. Mr. Castro is a federal law-enforcement officer and resident of Cameron County. After he was ordered to leave Minnesota, he spent more than three months in Texas before he was arrested on a Minnesota warrant. He did not flee during that time. Nothing in the record suggests that he made any effort to evade Minnesota, much less that he intends to flee to Mexico now.

Finally, Mr. Castro is under active orders and supervision of the federal government. Reports indicate he is subject to an ongoing investigation. The Governor fully expects that the United States is taking measures to ensure Mr. Castro will not leave the country. On this record, Minnesota's prediction of flight is rank speculation, not evidence of likely injury. Minnesota cannot show irreparable harm, and its request must be denied.

### B. The balance of the equities tips in favor of Governor Abbott's considered deliberation, not Minnesota's rush to judgment.

Where the government is the non-moving party, its interests and the harm it suffers "merge" with that of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must therefore "balance the competing claims of injury" and "consider the effect on each party of

the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24 (internal quotations omitted), while "pay[ing] particular regard to the public consequences" of an injunction, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

Those considerations weigh heavily against Minnesota. Texas would suffer immediate, concrete injury from the requested injunction. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. Minnesota asks this Court to do just that. Its requested relief would subordinate Governor Abbott's judgment to the preferences of a coordinate sovereign, invite a federal court to assume marionettist-like control over powers entrusted to Texas's Chief Executive Officer, and jeopardize Mr. Castro's right to be free from unlawful restraint—all based solely on Governor Walz's insistence that Mr. Castro is a fugitive and despite preliminary evidence suggesting he is not.

Meanwhile, any injuries to Minnesota are speculative at best and, even if they materialized, would not affect its ability to pursue the extradition of Mr. Castro. Governor Abbott may issue a warrant after August 26th (the date Minnesota claims harm will accrue) and even after August 27th (the actual date when Mr. Castro must be released by law). Minnesota cannot show the equitable balance requires the intervention of this Court now because it loses nothing by allowing the Governor's investigative process to play out.

Minnesota's position is also difficult to square with its own conduct. Governor Walz recently invoked Minnesota's pardon power on an expedited basis in an unsuccessful attempt to prevent the deportation of a depraved alien who was convicted of criminal sexual conduct after he confessed to repeatedly raping a 10-year-old child over the course of two years. Decl. ¶ 24.e (citing U.S. Dep't of Homeland Security, Press Release, *MINNESOTA MADNESS:*

*Governor Tim Walz Pardons Criminal Illegal Alien Convicted of Sexually Assaulting a 10-Year-Old Girl* (July 1, 2026), https://archive.is/074DI). Meanwhile, Governor Walz cannot brook the possibility of a federal immigration officer being disciplined by the federal government instead of Minnesota. Equity favors those with clean hands. *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*, 324 U.S. 806, 819 (1945). Governor Walz and Minnesota do not have them.

### C. The public interest requires a meaningful effort to ensure the liberty of an American is not restrained in violation of the Constitution.

The public interest also favors ensuring that the liberty of an American citizen is not needlessly restrained without a lawful basis for doing so. "[F]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). And the Fourth Amendment protects against "unfounded invasions of liberty." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975).

That interest does not disappear in the extradition context. Minnesota may have an interest in securing Mr. Castro's presence for prosecution, but the public interest lies in ensuring that the machinery of government does not become a means of depriving a person of liberty without lawful justification. The Governor may ultimately decide that Mr. Castro is a fugitive who must be surrendered, but the interests of justice do not require treating Governor Walz's accusation as sufficient by itself—especially in light of publicly available evidence that clouds its accuracy. *See Reggel*, 114 U.S. at 652 ("Any other interpretation would lead to the conclusion that the mere requisition by the executive of the demanding State" imposes a duty to apprehend and transfer individuals even if there is "incontestable proof, that the accused had, in fact, never been in the demanding State").

And there is a broader institutional interest at stake. The consequence of extradition is

the transfer of an individual into the custody of a different sovereign. Once that transfer occurs, the requestee State's control over the person vanishes. And once the requestee Governor certifies all prerequisites for extradition have been satisfied, the defendant's ability to seek *habeas* relief is also limited. *See Hogan v. O'Neill*, 255 U.S. 52, 56 (1921). The public has a legitimate interest in any decision to surrender being made deliberately and according to the law, rather than under the pressure of an artificial emergency.

The potential for abuse through unthinking use of the extradition tool is heightened here by Minnesota's ask to keep Mr. Castro in Sheriff Trevino's custody beyond the time authorized by law. It is a foundational constitutional principle that the government must have a reason for imprisoning someone. Right now, Sheriff Trevino's reason for detaining Mr. Castro is the detention authority in the UCEA, which uniquely allows Texas peace officers to detain a person to enforce another State's law without a Texas warrant or judgment. That power is limited by providing initial detention for thirty days, with a possible extension of 60 more days. TEX. CODE CRIM. PROC. art. 51.13, §§ 15, 17. Ordering Sheriff Trevino to continue restraining liberty even after those ninety days are up would conflict with the Fourth Amendment's prohibition on unreasonable seizures. *See, e.g.*, *Chiaverini v. City of Napoleon*, 602 U.S. 556, 563 (2024) ("[E]ven when a detention is justified at the outset, it may become unreasonably prolonged if the reason for it lapses . . . . [violating] the Fourth Amendment."). To imprison Mr. Castro because of mere convenience to Minnesota is unreasonable.

The public interest favors Governor Abbott's dutiful adherence to his obligations under law to ensure the prerequisites for extradition and continued detention have been met.

## CONCLUSION

The Court should deny Minnesota's request for emergency relief.

DATE: August 24, 2026

Respectfully submitted,

/s/ Trevor W. Ezell
TREVOR W. EZELL
*Attorney-in-Charge*
General Counsel
Texas Bar No. 24109849
S.D. Tex. Bar No. 3942308
Trevor.Ezell@gov.texas.gov

JASON T. BRAMOW
Deputy General Counsel
Texas Bar No. 24101545
S.D. Tex. Bar No. 3134903
Jason.Bramow@gov.texas.gov

MATTHEW ERICKSON*
Special Counsel
Texas Bar No. 24134310
Matthew.Erickson@gov.texas.gov
**Application for admission forthcoming*

Office of the Governor
P.O. Box 12428
Austin, Texas 78711
(512) 643-1788

*Counsel for Greg Abbott, in his official capacity as Governor, on behalf of the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the 24th day of August, 2026, upon all parties who have entered an appearance, using the CM/ECF system.

/s/ Trevor W. Ezell
TREVOR W. EZELL
General Counsel
Office of Governor Greg Abbott