**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

STATE OF MINNESOTA, *ex rel. Governor Tim Walz and Attorney General Keith Ellison*,

Plaintiff,

v.

GREG ABBOTT*, in his official capacity as Governor of the State of Texas,* and

MANUEL TREVINO, *in his official capacity as Sheriff of Cameron County, Texas,*

Defendants.

Case No.: 1:26-cv-00906

**REPLY IN FURTHER SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Minnesota filed this lawsuit on August 18, 2026, after dozens of inquiries about the status of Christian Castro's extradition. Governor Abbott did not respond to those inquiries. He now discloses, for the first time, that he is investigating whether Castro is a "fugitive" for purposes of the Extradition Clause and the Extradition Act. For the TRO hearing, Governor Abbott's purported investigation does nothing to undercut Minnesota's right to emergency relief as to Sheriff Trevino, who does not oppose relief on the merits and confirms that he will not release Castro if "otherwise ordered by the Court." Doc. 17 at 2. A stopgap TRO against Sheriff Trevino will give the Court more time, if needed, to resolve the legal issues posed by this case. *See* Fed. R. Civ. P. 65(b)(2).

But even if the Court wades into the merits now, Governor Abbott's opposition confirms that Minnesota is entitled to relief—full stop. *First*, the Court should not be fooled by the "investigation" into Castro's fugitive status. Governor Abbott concedes that Castro was present in Minnesota when the alleged crimes were committed. That concession is dispositive and renders Castro is a fugitive under the Extradition Clause and the Extradition Act. *Second*, Governor Abbott's scattershot jurisdictional arguments fail across the board. And *third*, all the remaining equitable factors favor emergency relief. Governor Abbott's decision to withhold Castro's extradition is causing an ongoing injury to Minnesota's federal rights to have Castro returned for prosecution. And there is a real risk that Castro will flee if he is released from custody in 48 hours, as the supplemental declarations from two investigators that are being submitted contemporaneously with this reply memorandum show.

The Court should grant Minnesota's application for a TRO.

## ARGUMENT

### I. The Court Has Jurisdiction.

Governor Abbott takes a kitchen-sink approach to jurisdiction. He argues that Minnesota's claims are not ripe; that sovereign immunity bars the suit; that mandamus is not authorized; and that the Supreme Court is the only appropriate venue. Each argument is meritless.

#### A. Minnesota's Claims Are Ripe.

Governor Abbott contends that Minnesota's claims are not ripe because he "has not refused its extradition demand." Doc. 20 at 8. Governor Abbott is wrong: Minnesota's claims present legal issues that are ripe for resolution now, and Governor Abbott's focus on his purported investigation into Castro's fugitive status does not change the ripeness analysis.

"The ripeness and standing analyses are closely related, as ripeness inquires as to whether the harm asserted has matured sufficiently to warrant judicial intervention." *Contender Farms L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 267 (5th Cir. 2015) (citation modified). The doctrine has both "constitutional and prudential dimensions." *Umphress v. Hall*, 133 F.4th 455, 467-68 (5th Cir. 2025). The constitutional dimension is whether "an 'actual controversy' exist[s] between the parties." *Id.* (quoting *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021)). The prudential ripeness doctrine gives a court the discretion to "decide not to hear a case." *Id.* (citation modified). The doctrine "considers the 'fitness' of the issues for judicial review or, put differently, 'whether the factual record is sufficiently developed,' as well as 'potential hardship to the parties that would result if judicial relief is denied.'" *Id.* (quoting *Susan B. Anthony List*, 573 U.S. 149, 167 (2014)).

Minnesota's claims are ripe under these standards. First, Governor Abbott does not appear to argue constitutional ripeness. That makes sense: Governor Abbott does not challenge Minnesota's standing, and Article III standing and Article III ripeness "'boil down to the same question.'" *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)). Here, the complaint alleges that Governor Abbott is unlawfully withholding Castro's extradition, which is causing an ongoing constitutional injury to Minnesota now by preventing and interfering with Castro's prosecution. And even if the Court were to construe the complaint as alleging future injury, the injury is imminent because of the "substantial risk" that Governor Abbott will withhold extradition. *Id.* at 463 (citation modified).

Second, Minnesota's claims satisfy the fitness and hardship standards. The fitness inquiry focuses on whether Minnesota's claims "are fit for judicial decision because they present issues that are 'purely legal . . . and will not be clarified by further factual development.'" *Id.* (quoting

*Susan B. Anthony List*, 573 U.S. at 167). The only "factual development" that Governor Abbott identifies is his purported inquiry into whether Castro is a "fugitive" for purposes of the Extradition Clause. *See* Doc. 20 at 8. But as discussed below, that argument is pure pretext: Castro *is* a fugitive for purposes of the Extradition Clause. *See infra* at 9-13.

Governor Abbott's reliance on *Puerto Rico v. Branstad*, 483 U.S. 219 (1987), is misleading for similar reasons. Doc. 20 at 9. He highlights how Puerto Rico's Governor made multiple requests to the Iowa's Governor before suing. True enough, but irrelevant, because before *Branstad*, federal courts had no power to enforce a governor's duty to extradite. 483 U.S. at 226-27. *Branstad* expressly overruled *Kentucky v. Dennison*, an 1861 precedent holding that federal courts lacked this power. *Id.* So, in the pre-*Branstad* world, Puerto Rico's Governor had no option but to ask Iowa's Governor to comply. In the post-*Branstad* world, a governor's duty to extradite *is* enforceable in federal court. Minnesota seeks only to enforce the right that Puerto Rico's Governor established.

Minnesota's claims also satisfy the hardship prong. Hardship focuses, among other things, on the costs of denying "prompt judicial review." *Umphress*, 133 F.4th at 468 (citation modified). The standard is flexible: hardship "inhere[s] in legal harms," including "practical harms on the interests of the party seeking relief." *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (citation modified). Governor Abbott does not directly engage with the hardship factor. *See* Doc. 20 at 8-10. But the argument seems to be that even if Governor Abbott withholds extradition, and Castro is released from custody, it will not impose any hardship on Minnesota. *Id.* at 9-10. The record refutes that claim. Governor Abbott's decision to withhold extradition imposes legal harm: it frustrates Minnesota's rights under the Extradition Clause and the Extradition Act, plus its right as a sovereign to the swift prosecution of an alleged crime that occurred within its borders. It also

imposes "practical harms" given the real and credible risk that Castro will flee if he is released and Governor Abbott withholds extradition. *See infra* at 13-16.

**B. Sovereign Immunity Does Not Bar Minnesota's Suit.**

The Governor next argues that sovereign immunity bars Minnesota's suit because of "structural immunity and what is properly called Eleventh Amendment immunity." Doc. 20 at 11. The theory is that Governor Abbott is immune from suit in federal district court. Governor Abbott's immunity arguments fail for two main reasons.

First, *Branstad* holds that federal courts have the authority to compel compliance with the Extradition Clause and the Extradition Act. 483 U.S. at 227-28. In reaching that conclusion, the *Branstad* court invoked *Ex parte Young*, observing that "[i]t has long been a settled principle that federal courts may enjoin unconstitutional action by state officials." *Id.* at 228 (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). As the Court explained, "[i]t would be superfluous to restate all the occasions on which this Court has imposed upon state officials a duty to obey the requirements of the Constitution, or compelled the performance of such duties." *Id.* And, as the Court also explained, "there is no justification for distinguishing the duty to deliver fugitives from the many other species of constitutional duty enforceable in federal courts." *Id.* Thus, Governor Abbott is right when he recognizes that "Minnesota may invoke *Ex Parte Young*." Doc. 20 at 11. But Governor Abbot fails to recognize, or even acknowledge, that the Supreme Court invoked *Ex parte Young* to anticipate and reject the same argument that he advances here.

Second, Governor Abbott contends that *Ex parte Young* only authorizes "prohibitory" injunctions. Doc. 20 at 12-13. Once again, *Branstad* relied on *Ex parte Young* and the principles it embodies when it held that federal courts can compel[] the performance of a governor's ministerial duty to extradite. 483 U.S. at 228. And while there is some debate about the scope of *Ex parte*

*Young*, there is no debate that *Ex parte Young* allows federal courts to direct state officials to perform "merely ministerial dut[ies]." 209 U.S. at 158. The duty to extradite is one of them.[1]

### C. This Court Has the Authority to Grant Both Injunctive Relief and Mandamus Relief.

Governor Abbott's next line of attack is to argue that the Court lacks the authority to award mandamus relief. This argument fails because (1) Minnesota's application for a TRO seeks injunctive relief, and (2) *Branstad* holds that federal courts have the authority to issue writs of mandamus to compel compliance with the Extradition Clause and the Extradition Act anyway.

First, as Governor Abbott appears to concede, Minnesota's TRO application asks the court to issue injunctive relief—not mandamus relief. *E.g.*, Doc. 20, 6-7 (identifying the standards for a TRO and a preliminary injunction). Governor Abbott does not dispute that federal courts have the authority to issue injunctive relief. That is sufficient to dispose of this argument.

Second, even if Minnesota's TRO application is construed to seek mandamus relief, *Branstad* authorizes it. Governor Abbott seems to recognize the problem, and he characterizes *Branstad* as a "'drive-by' jurisdictional ruling." Doc. 20 at 15-16 (quoting *Steel Co. v. Citizens for a Better Enviro.*, 523 U.S. 83, 91 (1998). That is a remarkable reading of *Branstad.* The Court *directly* held that federal courts can compel state officials to comply with the Extradition Clause and the Extradition Act via writs of mandamus. *See, e.g.*, *Branstad*, 483 U.S. at 227-28; *accord Alabama v. Engler*, 85 F.3d 1205, 1210 (6th Cir. 1996) (reversing the district court's denial of the

[1] Governor Abbott points to a footnote in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). *Larson* is mostly about the principles that apply when parties seek to enjoin unlawful or unconstitutional action by *federal* officials; it has little bearing here. *See Vann v. Kempthorne*, 534 F.3d 741, 750-55 (D.C. Cir. 2008). But even if it is relevant, the "unfortunate footnote" in *Larson* does not undermine the core *Ex Parte Young* principle that suits in federal court against state officials for alleged violations of federal law, and for prospective relief to enforce a state official's ministerial duties, are permissible. *Id.* at 752-53.

writ of mandamus and directing the writ to issue). Governor Abbott is free to advance his argument that *Branstad* was wrongly decided at the Supreme Court. But this Court is bound by it.

**D. This Court is the Appropriate Venue for this Dispute.**

Finally, this case need not be heard in the Supreme Court just because Governor Abbott is a defendant. To begin, Governor Abbott overlooks the well-established principle that where "a State is suing parties who are not other States, the original jurisdiction of the [Supreme Court] is not exclusive." *Illinois v. City of Milwaukee*, 406 U.S. 91, 101 (1972), *superseded by statute on other grounds*, *American Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011); *see also* 28 U.S.C. § 1251(b). Here, the complaint names Sheriff Trevino as a defendant, and Sheriff Trevino is a local official—not a state official. So the Supreme Court's jurisdiction is not exclusive.

But even if Governor Abbott *were* the only defendant, this suit would be enforceable in federal district court. Federal district courts have jurisdiction over disputes between a state and the officer of another state whenever the plaintiff state's alleged injury "was caused by arbitrary or improper administration of valid State laws" or where the suit does not implicate the sovereign interests of the other state. *Connecticut v. Cahill*, 217 F.3d 93, 99 (2d Cir. 2000).

Applying those principles, this court has jurisdiction because Minnesota's alleged injury "was caused by" Governor Abott's "arbitrary or improper administration of valid [Texas] laws." *Cahill*, 217 F.3d at 99. Specifically, the complaint alleges that Governor Abbott is unlawfully refusing to perform his mandatory, ministerial duty to execute a governor's rendition warrant for Castro. The claim is not one against "actions properly carried out" under Texas law. *Id*. On the contrary, Minnesota alleges that Governor Abbott's illegal refusal to perform this ministerial duty violates Texas law. *See, e.g.*, Doc. 2 at ¶¶ 22-27 (refusal to perform ministerial duty violates Tex. Code Crim. P. art. 51.01); *see also Louisiana v. Texas,* 176 U.S. 1, 22 (1900) (holding no exclusive

jurisdiction where challenge was "not that the laws of Texas in respect of quarantine are invalid, but that the health officer, by rules and regulations framed and put in force by him thereunder, places an embargo in fact on all interstate commerce between the state of Louisiana and the state of Texas," which was "more stringent than called for [by the laws of Texas], and . . . purposely framed with the view to benefit the state of Texas, and the city of Galveston in particular, at the expense of the state of Louisiana")*; see also Missouri v. Illinois,* 180 U.S. 208, 242 (1901) ("distinguishing this case from that of *Louisiana v. Texas*, [176 U.S. 1 (1900)] where the acts sought to be restrained were alleged to be those of officers or functionaries proceeding in a wrongful and malevolent misapplication of the quarantine laws of Texas").

Moreover, even if Governor Abbott has not acted arbitrarily or improperly, this Court has jurisdiction because Texas has no plausible sovereign interest in forestalling a valid request for extradition, as compared to "core sovereign interests" involved in "boundary disputes, disputes over water rights, and disputes over contracts between states." *Univ. of Utah v. Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V.*, 734 F.3d 1315, 1322 (Fed. Cir. 2013). Courts considering this prong address the interest question narrowly. *See id.* at 1323-24 (parsing question of ownership from inventorship in patent dispute to hold district court had jurisdiction). And Texas has no valid sovereign interest in Governor Abbott forestalling his obligation to perform the ministerial duty to extradite.

Against this backdrop, federal district courts—not the Supreme Court—have heard the few cases in which a governor refuses to extradite a fugitive. And to Minnesota's knowledge, every court to address this issue has accepted that jurisdiction was properly exercised. *See Branstad*, 483 U.S. at 222-24; *Alabama v. Engler*, 85 F.3d at 1207 (considering district court action by Alabama against Governor of Michigan). In fact, in *Branstad*, the Supreme Court denied a request to

exercise original jurisdiction and thereby forced the extraditing jurisdiction to proceed in district court. 483 U.S. at 2243 n.1; *Puerto Rico v. Iowa*, 464 U.S. 1034 (1984) (denying bill). Governor Abbott concedes this point. Doc. 20 at 16. He then then proceeds to argue that the Supreme Court's view of its original jurisdiction is "wrong," citing a slew of dissents. *Id.* But those dissents do not govern here, as even Governor Abbott acknowledges. *Id.* (preserving argument "should the Supreme Court see fit to revisit it").

## II. Minnesota is Likely to Succeed on the Merits Because Governor Abbott's Purported Investigation into Whether Castro is a "Fugitive" is a Smokescreen.

All of Governor Abbott's legal arguments hinge on his claim that he is investigating whether Castro is a "fugitive" within the meaning of the Constitution. *E.g.*, Doc. 20 at 1-2. But Governor Abbott never mentions the Supreme Court's post-*Branstad* decision in *New Mexico ex rel. Ortiz v. Reed*, which forecloses this argument. 524 U.S. 151 (1998). He also ignores precedents that predate *Ortiz* and *Branstad* that confirm that Governor Abbott's alleged investigation cannot frustrate Minnesota's right to have Castro extradited.

*Ortiz* disposes of Governor Abbott's fugitive investigation argument. Governor Abbott asserts that if ICE sent Castro back to Texas as part of his job duties, Castro does not qualify as a "fugitive" who is subject to extradition under the Constitution and federal law. That is indistinguishable from the argument in *Ortiz*, where the parolee claimed that "he was not a 'fugitive' for purposes of extradition because he fled under duress." 524 U.S. at 152. The New Mexico Supreme Court agreed with that argument, and held that the parolee was not a fugitive but a "refugee from injustice." *Id.* (citation modified).

In a *per curiam* opinion, the Supreme Court reversed. It held that the reason for parolee's "fugitive" status "is simply not the kind of issue that may be tried in the asylum state." *Id.* at 153. The Court emphasized that "claims relating to what actually happened in the demanding State, the

law of the demanding State, and what may be expected to happen in the demanding State when the fugitive returns are issues that must be tried in the courts of that State, and not those of the asylum State." *Id.* And the Court reaffirmed its conclusion from *Branstad* that "the commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers of the asylum State." *Id.* at 154 (citation modified). It further reaffirmed that New Mexico should not have gone "beyond the permissible inquiry in an extradition case," because extradition was supposed to be a "summary" proceeding. *Id.* at 155.

Governor Abbott concedes that Castro was present in Minnesota at the time of the alleged crimes. Doc. 20-1, Bramow Decl. ¶ 24(f). And Castro was arrested in Texas and is currently in Cameron County custody. These undisputed facts are sufficient to establish that Castro is a fugitive for purposes of the Extradition Clause and the Extradition Act, and Castro's reason for traveling from Minnesota to Texas is irrelevant to the analysis.

Governor Abbott's effort to engraft additional requirements onto the definition of a "fugitive" for purposes of the Extradition Clause and the Extradition Act is baseless. Indeed, the Tenth Circuit has held that an individual who was in state custody in Wyoming and was transferred from there to federal custody in Kansas qualified as a fugitive for purposes of extradition back to Wyoming. *Gee v. Kansas*, 912 F.2d 414, 419 (10th Cir. 1990) ("Once petitioner was moved outside Wyoming State boundaries, he became a fugitive from justice within the meaning of 18 U.S.C. § 3182."). The *Gee* court had no difficulty in holding the petitioner qualified as a fugitive under the Extradition Act despite lacking any control over his transfer from state custody in one state to federal custody in another.

The pre-*Branstad* authorities upon which Governor Abbott relies are not to the contrary and make it clear that Governor Abbott's purported investigation into the reason for Castro's

departure from Minnesota is unwarranted. Doc. 20 at 18-19. For example, in *Appleyard v. Massachusetts*, 203 U.S. 222 (1906), a petitioner sought habeas relief from extradition to New York based both on his claim that he was not present in New York on the date of the charged crime and that he had no belief when leaving New York that he had violated any of its laws. After finding that the petitioner was present in New York on the date of the charged crimes, the Supreme Court refused to consider whether he "consciously" fled from justice. *Id.* at 227. Instead, the Court emphatically held that a person who leaves a state "no matter for what purpose or with what motive, nor under what belief,[] becomes, from the time of such leaving, and within the meaning of the Constitution and laws of the United States, a fugitive from justice." *Id.* The Court explained the reasons that such a person must be delivered to the requesting state for extradition:

> Such is the command of the supreme law of the land, which may not be disregarded by any state. The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several states,[] an object of the first concern to the people of the entire country, and which each state is bound, in fidelity to the Constitution, to recognize. A faithful, vigorous enforcement of that stipulation is vital to the harmony and welfare of the states. And while a state should take care, within the limits of the law, that the rights of its people are protected against illegal action, the judicial authorities of the Union should equally take care that the provisions of the Constitution be not so narrowly interpreted as to enable offenders against the laws of a state to find a permanent asylum in the territory of another state.

*Id.* at 227-28.

Similarly, in each of the authorities Governor Abbott cites, the sole dispute was whether the defendant was physically present in the requesting state at the time the alleged crime took place. *See Hyatt v. New York*, 188 U.S. 691, 719 (1903) (affirming habeas relief granted to a petitioner who was "not within the state of Tennessee at the times stated in the indictments found in the Tennessee court, nor at any time when the acts were, if ever, committed" because he was not a fugitive from Tennessee); *Bassing v. Cady*, 208 U.S. 386, 392-94 (1908) (holding petitioner

was who was present in New York at the time of the charged crime and later found in Rhode Island qualified as a fugitive, explaining that if he was in New York and later left New York "no matter for what reason or under what belief, he was a fugitive from the justice of that state within the meaning of the Constitution and laws of the United States"); *Ex parte Reggel*, 114 U.S. 642, 651-53 (1885) (affirming asylum state governor's reliance on indictment charging petitioner with committing a crime in requesting state to establish fugitive status, while a governor need not surrender a fugitive if he is "satisfied from incontestable proof that the accused had, in fact, never been in the demanding state"); *Roberts v. Reilly*, 116 U.S. 80, 97 (1885) (holding requirements to qualify as a fugitive for purposes of extradition are "simply that, having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offense, he has left its jurisdiction, and is found within the territory of another"); s*ee also Drew v. Thaw*, 235 U.S. 432, 439 (1914) (holding inmate who escaped an insane asylum and was found in another state qualified as a fugitive because "for purposes of extradition between the states, it does not matter what motive induced the departure"). But here, Governor Abbott does not dispute that Castro was physically present in the requesting state. That is sufficient to render Castro a fugitive for purposes of the Extradition Clause and the Extradition Act.

Governor Abbott's attempt to analogize the definition of "flight" for purposes of the federal unlawful flight to avoid prosecution ("UFAP") statute rings hollow. The UFAP statute, 18 U.S.C. § 1073, is a criminal statute that punishes defendants who travel interstate "with intent . . . to avoid prosecution" with up to five years' imprisonment. It stands to reason that, as a criminal statute, the UFAP statute contains an element of scienter that the government must prove to convict a defendant. But the Extradition Clause and the Extradition Act are not criminal statutes. They exist for the benefit of the states to provide a framework to obtain the return of individuals: "Neither the

Extradition Clause of the Constitution nor the federal extradition statute purports to confer any right on the fugitive." *Barton v. Norrod*, 106 F.3d 1289, 1297 (6th Cir. 1997). "Rather, they confer rights and duties on the executive authorities of the states." *Id.*

Governor Abbott's position, if accepted, would mean that any time a person committed a crime in one state and then left the state because of a job transfer, because of military orders, or even because they were shoved in a van, they could never be extradited to face prosecution. Such an outcome would be inconsistent with the Extradition Clauses' intended purposes: "to enable each state to bring offenders to trial as swiftly as possible in any state where the alleged offense was committed and to preclude any state from becoming a sanctuary for fugitives from justice of another state." *Branstad*, 483 U.S. at 227 (citation modified).

## III. The Remaining Factors Favor Emergency Relief.

### A. Minnesota Has Established a Threat of Irreparable Harm.

Minnesota faces irreparable harm on two fronts: first, by the injury to its constitutional right to have Castro extradited to and prosecuted in the State of Minnesota where his offense conduct occurred, and second, by the real risk that Castro will flee to Mexico if released from Cameron County's custody.

Governor Abbott does not deny that infringement of a constitutional right constitutes irreparable injury. Instead, he insists no constitutional infringement has occurred, at least not yet. But the imminent *threat* of irreparable harm is sufficient to entitle a moving party to injunctive relief, particularly where the threat implicates a constitutional right. *See Elrod v. Burns*, 427 U.S. 347 (1976) (applying the irreparable harm standard as including instances where constitutional violations are either "threatened or in fact being impaired"); *see also Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 294-97 (5th Cir. 2012) (finding that a church had met its burden

to show irreparable harm to its constitutional rights based, in part, on prospective harms, such as the church's inability to increase membership for the future, and the risk of losing a lease opportunity.) Here, Governor Abbott has placed Minnesota's constitutional right to have Castro extradited and duly prosecuted under imminent threat, and that threatened constitutional injury is sufficient grounds for relief on its own.

The additional factor of Castro's flight risk compounds the risk of harm. Here again, Governor Abbott does not dispute that if Castro is permitted to flee to Mexico, Minnesota will be irreparably harmed in its ability to return him to Minnesota for prosecution. Instead, Governor Abbott questions the evidentiary basis for Minnesota's concern. Contrary to Governor Abbott's minimization, that risk of flight is substantial.

Castro's jail calls from his time in Cameron County custody establish that he is fluent in Spanish and in a close, personal, romantic relationship with a woman who resides in Progreso, Mexico. (Montes Decl. ¶¶ 4-5; 7.) The calls also include statements by Castro indicating an intention to marry his romantic partner and purchase a home in Mexico to retire there. (*Id.* at ¶¶ 7a, 7b.) In his jail calls, Castro has also discussed having his sister retrieve some of his personal property from his prior residence and arranging for his sister to visit his romantic partner in Progreso, Mexico. (Montes Decl., ¶ 7b). Other law enforcement summaries of jail calls reflect conversations in which Castro has asked his romantic partner about the status of a Jeep he owns but which was in his romantic partner's possession in Mexico. (Lyfoung Decl., ¶ 4.)

In addition to those jail calls, investigators interviewed "M.V.," a woman Castro married in 2024 but filed to divorce in December 2025. (*Id.* at ¶ 6.) M.V. told investigators that Castro had moved out of their home in Texas by November 2025 in order to be in a relationship with a woman residing in Mexico. (*Id.*) M.V. also relayed her belief that Castro had purchased a

property in Mexico where his girlfriend resides, and had purchased a Jeep in his name which he left in Mexico in his girlfriend's possession. (*Id.*) Additional investigative materials indicate that, despite having a serious relationship with a Mexican-national, Castro submitted paperwork for his federal employment in January 2026 that fails to list foreign contacts. (*Id.* at ¶ 5.)

In short: evidence shows Castro making financial and familial preparations to relocate his life to Mexico even before his charged conduct in January 2026, and Minnesota has a substantial basis to worry that Castro's release from custody may be all the opportunity he needs to abscond.

**B. Governor Abbott's Pretextual Concerns Do Not Change the Balance of Equities and Public Interest Analysis, Which Favors Minnesota.**

Governor Abbott makes two arguments related to the public interest and balancing of equities: one that is pretextual, and another that is both pretextual and outside his scope. Neither can outweigh the strong public interest and remaining equities that favor this Court's issuance of an order requiring Governor Abbott to perform his constitutional duty.

On his side of the equities, the only risk that Governor Abbot claims to face is the risk of being treated like a marionette by the federal court if his pretextual investigation is cut short. *See* Doc. 20 at 35. But being accountable to follow the law and suspend a baseless inquiry is not an injury.

Nor can Governor Abbott ask this Court to weigh Castro's right to be free from unlawful restraint as a public interest factor. Governor Abbott lacks standing to assert Castro's rights. *See* *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975). If Castro's detention has been extended, that is a problem of Governor Abbott's own making. The merits of Minnesota's charges against Castro, and the manner and duration of his custody and his eligibility for release or continued detention, are all issues which can and should be litigated in Minnesota where he faces charges. Governor Abbott's attempt to position himself as an executive-branch arbiter of Castro's constitutional

rights has no basis in either the facts of this case or the legal framework which governs Minnesota's TRO application. Minnesota does not ask this Court to ignore Castro's constitutional rights. Instead, Minnesota asks this Court to issue an order that enforces both Minnesota and Castro's rights by ensuring his prompt extradition to the jurisdiction where his criminal case is pending.

## CONCLUSION

The Court should grant Minnesota's application for a TRO in full. But at minimum, the Court should grant the TRO as to Sheriff Trevino, who does not oppose relief, and set this case for expedited preliminary injunction briefing so the Court can make a decision on a full record.

[*Signatures on the following page*]

Dated: August 25, 2026

Respectfully submitted,

/s/ *George C. Lobb, Esq.*
GEORGE C. LOBB, ESQ.
TX State Bar No. 24042928
S.D. Tex. Bar No. 1439085
2028 Ben White Blvd.
Suite 240-8990
Austin, TX 78741
(737) 396-2662
Inboxforlawoffice@iCloud.com

KEITH ELLISON
Attorney General
State of Minnesota

/s/ *Peter J. Farrell*
PETER J. FARRELL*
Acting Solicitor General
Attorney-in-Charge
MN State Bar No. 0393071
KIMBERLY SVENDSEN*
Special Counsel
MN State Bar No. 0504097
LINDSEY MIDDLECAMP*
Special Counsel
MN State Bar No. 0392589
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1424
peter.farrell@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota, ex rel. Governor Tim Walz and Attorney General Keith Ellison*

**Pro hac vice*