**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF MINNESOTA, *ex rel. Governor Tim Walz and Attorney General Keith Ellison*, | § | |
| *Plaintiff*, | § | |
| v. | § | CIVIL ACTION NO. 1:26-CV-00906 |
| GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and | § | |
| MANUEL TREVINO, *in his official capacity as Sheriff of Cameron County, Texas*, | § | |
| *Defendants*. | § | |

**DEFENDANT GREG ABBOTT'S MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM**

## Table of Contents

**Page**


Table of Authorities ........ ii

Introduction ........ 1

Background ........ 3

Summary of the Argument ........ 6

Argument ........ 7

- I. This Court Lacks Jurisdiction to Entertain Minnesota's Lawsuit........ 7
  - A. This effort to short-circuit Governor Abbott's deliberations—before a denial has even issued—is not ripe. ........ 8
  - B. Minnesota cannot show standing based entirely on speculative action by third parties. ........ 10
  - C. Sovereign immunity bars this suit against the Governor of Texas for his efforts to comply with the Extradition Clause. ........ 13
  - D. Nothing authorizes Minnesota to conscript federal courts into issuing writs of mandamus to state officers here........ 15
  - E. The Supreme Court of the United States is the only appropriate venue for this dispute between two States. ........ 18
- II. Minnesota Fails to State a Claim for Relief. ........ 19
  - A. Governor Abbott has a solemn obligation to determine whether all predicates are met to trigger the extradition power. ........ 19
  - B. The obligation to determine predicate facts is not ministerial, as evidenced by a century of practice and precedent. ........ 22
  - C. Minnesota has not pled non-conclusory facts sufficient to show Mr. Castro is a fugitive within the meaning of the Constitution. ........ 24

Conclusion ........ 29

Certificate of Service ........ 31

# Table of Authorities

Page(s)

**Cases:**

*Alabama v. California*,
145 S. Ct. 757 (2025) .......... 19

*Alabama ex rel. Governor & Atty. Gen. v. Engler*,
85 F.3d 1205 (6th Cir. 1996) .......... 23

*Appleyard v. Massachusetts*,
203 U.S. 222 (1906) .......... 21, 22, 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Bassing v. Cady*,
208 U.S. 386 (1908) .......... 21, 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007) .......... 6

*Biddinger v. Comm'r of Police,*
245 U.S. 128 (1917) .......... 20

*Board of Liquidation v. McComb*,
92 U.S. 531 (1876) .......... 15, 19, 22

*California v. Superior Ct. of Calif.*,
482 U.S. 400 (1987) .......... 20

*California v. West Virginia*,
454 U.S. 1027 (1981) .......... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 12, 13

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) .......... 19

*Colorado v. Kansas*,
320 U.S. 383 (1943) .......... 9

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 8

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
634 F.3d 787 (5th Cir. 2011) .......... 6

*Hyatt v. Corkran*,
188 U.S. 691 (1903) .......... 4, 14, 20, 21, 22, 23, 25, 27, 28

*J.W. v. Paley*,
81 F.4th 440 (5th Cir. 2023) .......... 19

*Kentucky v. Dennison*,
24 How. (65 U.S.) 66 (1861) .......... 17, 18, 21

*La Buy v. Howes Leather Co.*,
352 U.S. 249 (1957) .......... 17

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949)....15
*Louisiana v. Mississippi*,
488 U.S. 990 (1988)....18
*Lujan v. Defs. of Wildlife*,
504 U.S. 555, 561 (1992)....11
*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*,
446 F.2d 353 (5th Cir. 1971)....12
*Maryland v. Louisiana*,
451 U.S. 725 (1981)....14
*McIntyre v. Wood*,
7 Cranch (11 U.S.) 504 (1813)....17
*Mealey v. Gautreaux*,
No. 16-716-JWD-RLB, 2020 WL 515853 (M.D. La. Jan. 31, 2020)....3
*Med Care Emergency Med. Services, Inc. v. Pharr, Tex.*,
762 F. Supp. 3d 587 (S.D. Tex. 2025)....5, 6
*Michel v. Louisiana*,
350 U.S. 91 (1955)....27
*Michigan v. Doran*,
439 U.S. 282 (1978)....20, 21, 23, 24
*Mississippi v. Johnson*,
71 U.S. 475 (1866)....22
*Mississippi v. Louisiana*,
506 U.S. 73 (1992)....18
*Moye v. Clerk, DeKalb County Superior Court*,
474 F.2d 1275 (5th Cir. 1973) (per curiam)....17
*Nat'l Park Hosp. Ass'n v. Dept. of Interior*,
538 U.S. 803 (2003)....8
*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
833 F.2d 583 (5th Cir. 1987)....8
*Paterson v. Weinberger*,
644 F.2d 521 (5th Cir. 1981)....6–7
*PennEast Pipeline Co. v. New Jersey*,
594 U.S. 482 (2021)....13
*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)....14
*People ex rel. McNichols v. Pease*,
207 U.S. 100 (1907)....24
*Peters v. Davis*,
No. CV H-18-3204, 2019 WL 127076 (S.D. Tex. Jan. 7, 2019)....16, 18
*Pierce v. Creecy*,
210 U.S. 387 (1908)....21

*Principality of Monaco v. Mississippi*,
292 U.S. 313 (1934) .... 13
*Puerto Rico v. Branstad*,
483 U.S. 219 (1987) .... 9, 17, 18, 20, 21
*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) .... 7
*Ex parte Reggel*,
114 U.S. 642 (1885) .... 17, 21, 22, 23
*Roberts v. Reilly*,
116 U.S. 80 (1885) .... 2, 14, 21, 22, 27, 29
*Shields v. Norton*,
289 F.3d 832 (5th Cir. 2002) .... 8
*Simon v. Eastern Ky. Welfare Rights Organization*,
426 U.S. 26, 41–42 (1976) .... 11
*In re Simpson*,
586 P.2d 1389 (Kan. Ct. App. 1978) .... 11
*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .... 9
*Spokeo, Inc. v. Robins*,
578 U. S. 330, 340 (2016) .... 10
*Steel Co. v. Citizens for a Better Enviro.*,
523 U.S. 83 (1998) .... 7, 18
*Susan B. Anthony's List v. Driehaus*,
573 U.S. 149 (2014) .... 8
*Terrell v. Town of Woodworth,*
No. 1:21-CV-04224, 2023 WL 4115769 (W.D. La. June 7, 2023) .... 3
*Terrell v. Town of Woodworth,*
No. 1:21-CV-04224, 2023 WL 4115879 (W.D. La. June 21, 2023) .... 3
*Terrell v. Town of Woodworth,*
No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024) .... 3
*Texas v. California*,
141 S. Ct. 1469 (2021) .... 19
*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) .... 28
*Texas v. United States*,
523 U.S. 296 (1998) .... 8
*TransUnion LLC v. Ramirez*,
594 U.S. 413, 423 (2021) .... 10, 11
*Turner v. Pleasant*,
663 F.3d 770 (5th Cir. 2011) .... 6
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .... 18

*United Sovereign Americans, Inc. v. Nelson*,
762 F. Supp. 3d 523 (N.D. Tex. 2025) .......... 16
*United States v. Chem. Found.*,
272 U.S. 1 (1926) .......... 9
*United States v. Frank*,
864 F.2d 992 (3d Cir. 1988) .......... 27
*United States v. Palomar-Santiago*,
593 U.S. 321 (2021) .......... 24, 25
*United States v. Texas*,
143 U.S. 621 (1892) .......... 13, 18
*U.S. ex rel. Knapp v. Lake Shore & M.S.R. Co.*,
197 U.S. 536 (1905) .......... 17
*U.S. ex rel. McCline v. Meyerling*,
75 F.2d 716 (7th Cir. 1934) .......... 24
*Voisine v. United States*,
579 U.S. 686 (2016) .......... 25
*In re Voorhees*,
32 N.J.L. 141 (1867) .......... 27
*Whole Women's Health v. Jackson*,
595 U.S. 30 (2021) .......... 14
*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) .......... 9
*Ex parte Young*,
209 U.S. 123 (1908) .......... 7, 14, 15

**Constitutional Provisions, Statutes, and Rules:**

U.S. CONST. art. III .......... 8
U.S. CONST. art. III, § 2, cls. 1–2 .......... 18
U.S. CONST. art. IV, § 2, cl. 2 .......... 1, 4, 14, 25
U.S. CONST. art. VI, cl. 2 .......... 14
18 U.S.C.:
§ 1073 .......... 26
§ 3182 .......... 20
28 U.S.C.:
§ 1251(a) .......... 18
§ 1331 .......... 16
§ 1361 .......... 16
§ 1367 .......... 16
§ 1651(b) .......... 17
42 U.S.C. § 1983 .......... 9
FED. R. CIV. P. 12:
(b)(1) .......... 7
(b)(6) .......... 6

FED. R. CIV. P. 81(b) ........ 16
FED. R. CIV. P. 201 ........ 3, 5
TEX. CODE CRIM. PROC. art. 51.13:
§ 4 ........ 5, 8, 9, 23
§ 8 ........ 11
§ 9 ........ 11
§ 15 ........ 10
§ 16 ........ 11–12
§ 17 ........ 10
§ 21 ........ 11
MINN. STAT. § 629.04 ........ 11, 23

**Other Authorities:**

Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac ........ 5
Kyle Brown, *Bond Set at $2,000 for ICE Agent Charged in Nonfatal Shooting in Minneapolis*, KSTP (June 4, 2026), https://archive.is/IQG3G ........ 3
Jose De Leon, III, *Prosecutor Asks Gov. Abbott to Sign Extradition Papers for RGV ICE Agent Facing Assault Charges in Minnesota*, KRGV (Aug. 3, 2026), https://archive.is/Sa7dJ ........ 6
THE FEDERALIST No. 81 ........ 13
Ernesto Londono et al., *Newly Obtained Video of Minneapolis Shooting Undermines ICE Account*, N.Y. TIMES (Apr. 6, 2026), https://archive.ph/SVSnz ........ 3–4
Stefany Rosales, *Bail Ordered at $200K for Valley ICE Agent Wanted in Minnesota*, KRGV (June 4, 2026), https://archive.ph/C6SIW ........ 3
WEBSTER'S NEW COLLEGIATE DICTIONARY (1949) ........ 25

## INTRODUCTION

The extradition power is singular in our constitutional order. It allows State A to exercise its sovereign power to restrain the liberty of an individual solely to facilitate the sovereign power of State B, whose criminal laws State A typically has no power to enforce. That is heady stuff. Unsurprisingly, the U.S. Supreme Court has long required considered judgment before wielding this awesome power. Among other limits, the Constitution's Extradition Clause says it applies only to "a Person . . . who shall flee from Justice, and be found in another State." U.S. CONST. art. IV, § 2, cl. 2. The ordinary meaning of a fugitive entails a volitional act of fleeing, not mere involuntary movement across state lines.

Any reasonable person would say that, if a man commits a crime in Minneapolis, Minnesota, and is then forcibly abducted by being shoved into a van and driven to Chippewa Falls, Wisconsin, he is not a fugitive who "fled" Minnesota. Volition matters. For that reason, Governor Abbott directed the Secretary of State—almost one month ago—to investigate whether Mr. Castro is a fugitive based on public reports and a preliminary investigation indicating he may have been *ordered* to return to Texas by ICE. The Governor has serious doubts that Mr. Castro qualifies as a fugitive, but the Governor has not yet received a report from the Secretary and so has not made a decision concerning Minnesota's request.

But Minnesota refuses to wait. It filed this lawsuit, even though its request has not been denied. Now it takes the remarkable position that a requesting State may unilaterally declare someone to be a fugitive and that no other actor—not even the Governor who received the request—may consider real-world facts about how the individual concerned moved from the requesting State. In its view, sovereignty does not matter; the cell doors must stay closed based on bare, unproven say-so. That is not the law. For a century, the Supreme Court has

obligated the requestee Governor to "decide, upon such evidence as he may deem satisfactory," whether "the person demanded is a fugitive from the justice of the State the executive authority of which makes the demand." *Roberts v. Reilly*, 116 U.S. 80, 95 (1885). And he must do that "before he can lawfully comply with" the requisition demand—that is, before any mandatory or ministerial duty to extradite is triggered. *Ibid.*

Governor Abbott has routinely done this faithfully, as even Minnesota repeatedly concedes. But Minnesota suddenly takes issue with this one extradition application and refuses to accord Governor Abbott's deliberative process the presumption of regularity it is due. Given this odd rush to judgment, it is difficult to ignore the possibility that Governor Tim Walz is content to look the other way when the context is sexual violence against children by illegal aliens, but not when the context is immigration enforcement by federal officers.

At the end of the day, the context should not matter. The Constitution's extradition authority, together with the limits placed upon it, must apply evenhandedly, no matter who the putative defendant is or what he is alleged to have done. No State may short-circuit the Constitution's protections simply because it wants to claim its pound of flesh. The Court should dismiss this suit entirely.

## BACKGROUND[1]

Christian Castro is an ICE agent who was charged on May 18, 2026, with state criminal offenses in Minnesota. Compl. ¶ 33. Mr. Castro was later found in Texas, where he was arrested on May 29, 2026, pursuant to a nationwide warrant issued by a Minnesota district court. Compl. ¶ 35.

Public reports indicated something curious about how he arrived in Texas. According to his lawyer, Mr. Castro "was in the Rio Grande Valley as part of his job obligations" when he was apprehended. Kyle Brown, *Bond Set at $2,000 for ICE Agent Charged in Nonfatal Shooting in Minneapolis*, KSTP (June 4, 2026), https://archive.is/IQG3G. In other words, it appeared the federal government may have ordered the federal agent to leave Minnesota and return to his duty station in Texas. Stefany Rosales, *Bail Ordered at $200K for Valley ICE Agent Wanted in Minnesota*, KRGV (June 4, 2026), https://archive.ph/C6SIW (Castro claiming he "was not a fugitive" and "was here in the area [Texas] pursuant to his job obligations"). Federal officials have indicated Mr. Castro is subject to an ongoing investigation and "could end up facing criminal charges" by the U.S. Department of Justice for his conduct on January 14th and for statements he made in the aftermath. Ernesto Londono et al., *Newly Obtained Video of Minneapolis Shooting Undermines ICE Account*, N.Y. TIMES (Apr. 6, 2026),

[1] To the extent a news article that is not incorporated by reference into Minnesota's complaint is referenced herein, the "court may take judicial notice of the coverage and existence of newspaper and magazine articles." *Terrell v. Town of Woodworth*, No. 1:21-CV-04224, 2023 WL 4115769, at *3 (W.D. La. June 7, 2023), *report and recommendation adopted*, No. 1:21-CV-04224, 2023 WL 4115879 (W.D. La. June 21, 2023), *aff'd*, No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024) (citing *Mealey v. Gautreaux*, 2020 WL 515853, at *23 (M.D. La. Jan. 31, 2020)); FED. R. CIV. P. 201. Critically, and as is consistent with the *Terrell* court's ruling, Governor Abbott relies on the mere existence of these articles, which gave rise to the Governor's request to the Secretary of State for an investigation, in support of this motion. For purposes of this motion, the veracity of the facts contained in the articles is irrelevant.

https://archive.ph/SVSnz.

Despite all this complexity surrounding Mr. Castro's arrival in Texas, Governor Walz submitted a requisition on June 2, 2026, demanding Mr. Castro's extradition to face criminal charges in Minnesota. Compl. ¶ 36.

Over succeeding weeks, staff in the Office of the Governor (OOG) endeavored to investigate the facts of Mr. Castro's movement out of Minnesota to ascertain whether it was true that he "fled from the jurisdiction . . . and is now a fugitive," as Minnesota claimed. ECF No. 2-1 at 3. That is consistent with Governor Abbott's duty under the U.S. Constitution. As the Supreme Court observed more than a century ago, because the extradition power applies only to "a person . . . who shall flee" from one State to another, U.S. CONST. art. IV, § 2, cl. 2, "it must appear to the [requestee] governor, *before he can lawfully comply with the demand for extradition*, that the person demanded is substantially charged with a crime against the laws of the State from whose justice he is alleged to have fled . . . and *that the person demanded is a fugitive* from the justice of the State the executive authority of which makes the demand," *Hyatt v. Corkran*, 188 U.S. 691, 709 (1903) (emphases added).

While Texas officials endeavored to ensure the Constitution was complied with, Minnesota personnel continued to pressure OOG's non-attorney staff to rush out an extradition warrant and to divulge the status of ongoing deliberations. Compl. ¶¶ 38, 42. Those deliberations, of course, are protected by various privileges, including the attorney-client and deliberative process privileges. That is why Minnesota was politely instructed "to direct its communications to" attorneys within OOG instead. Compl. ¶ 40.

OOG's investigative process uncovered additional details about Mr. Castro's return to Texas and resulted in "serious concerns" about whether he qualified as a fugitive under the

Constitution. Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac.[2] Accordingly, the Governor dutifully invoked statutory procedures designed for scenarios just like this. Section 4 of the Uniform Criminal Extradition Act (UCEA)—titled "GOVERNOR MAY INVESTIGATE CASE"—provides that "the Governor may call upon the Secretary of State, Attorney General or any prosecuting officer in this State to investigate or assist in investigating the demand, and to report to him . . . whether [the person] ought to be surrendered." TEX. CODE CRIM. PROC. art. 51.13, § 4. Almost one month ago, Governor Abbott directed the Secretary of State in a public letter "to investigate the demand and report to [the Governor] concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." Abbott Letter, *supra*.

The Governor has not yet received the report from the Secretary of State. And he has not yet denied (or approved) Governor Walz's requisition, as even Minnesota candidly admits. *See* Compl. ¶ 46. Even so, Minnesota rushed to file this lawsuit, claiming (incredibly) that an ICE agent subject to ongoing federal investigations—and who never bothered to post bond—was somehow a flight risk to Mexico because he "is fluent in Spanish." Compl. ¶ 47. While Minnesota acknowledged that Governor Abbott's office "routinely" facilitates prompt extraditions to Minnesota consistent with Texas's duties under the Extradition Clause, Compl. ¶¶ 28–32, it nevertheless refused to consider the possibility that the "unusual and inconsistent" outcome here might be a function of Minnesota's own failure to ensure the

---

[2] The Governor's letter is public record and subject to judicial notice pursuant to FED R. CIV. P. 201. *Med Care Emergency Med. Servs., Inc. v. Pharr, Tex.*, 762 F. Supp. 3d 587, 590 n.2 (S.D. Tex. 2025) (Rodriguez, J.)

Constitution was complied with when it simply declared him a "fugitive."

Now, Minnesota asks this Court to issue a writ of mandamus against the Governor and forcibly order that Mr. Castro be extradited to Minnesota or be restrained in his liberty longer than statutes allow. Mr. Castro continues to maintain that he "was not a fugitive," that "he was still employed," and that "he was here in the area pursuant to his job obligations" for ICE. Jose De Leon, III, *Prosecutor Asks Gov. Abbott to Sign Extradition Papers for RGV ICE Agent Facing Assault Charges in Minnesota*, KRGV (Aug. 3, 2026), https://archive.is/Sa7dJ.

## SUMMARY OF THE ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted); *see* FED. R. CIV. P. 12(b)(6). Mere " 'labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Med Care Emergency Med. Services, Inc.*, 762 F. Supp. 3d at 593 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Conclusory factual allegations are to be disregarded. *See Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). The Court also does not have to accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (internal quotations omitted). Rather, the plaintiff must plead factual content sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Separately, facial motions to dismiss based on a lack of jurisdiction under Rule 12(b)(1), like this one, are judged by the same standard. *See Paterson v. Weinberger*, 644 F.2d

521, 523 (5th Cir. 1981). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

First, numerous justiciability hurdles—from standing to ripeness to sovereign immunity to limits on mandamus—deprive this Court of jurisdiction at the outset. Second, Minnesota fails to state a claim on the merits. A century of Supreme Court precedent and the plain meaning of the Extradition Clause require the Governor to determine for himself the existence of a set of predicate facts to trigger the extradition obligation based on evidentiary proof. As a matter of law, Minnesota's effort to rush the Governor's deliberations—and unilaterally deem Mr. Castro to be a fugitive—cannot establish any "ministerial" duty to undergird a mandamus claim.

## Argument

### I. This Court Lacks Jurisdiction to Entertain Minnesota's Lawsuit.

Before exercising coercive power over a defendant, a court must assure itself that it has jurisdiction. *Steel Co. v. Citizens for a Better Enviro.*, 523 U.S. 83, 94–95 (1998). Jurisdiction does not exist here. This dispute over an extradition request that has never been denied is not yet ripe. Minnesota lacks standing because it cannot show anything more than speculative harm arising from the actions of a third party. The Governor is immune from suit—and *Ex parte Young* provides no workaround—where he is endeavoring to fulfill, rather than evade, federal law. Federal courts lack authority to issue writs of mandamus to effectively commandeer state officials. And a proper reading of federal law shows that a case like this must be filed in the U.S. Supreme Court. These justiciability defects are grounds to dismiss this suit out of hand. Denying this motion over these objections would also ground an immediate appeal.

### A. This effort to short-circuit Governor Abbott's deliberations—before a denial has even issued—is not ripe.

Ripeness, like standing, is an absolute prerequisite to exercising subject matter jurisdiction because both doctrines "'originate' from the same Article III limitation." *Susan B. Anthony's List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). Minnesota's claim is not ripe because Governor Abbott has not refused its extradition demand. He has not made a final decision at all. Texas law permits him, upon receiving a demand from another State, to order others in the Executive Department to investigate the demand and report "whether [an individual] ought to be surrendered." TEX. CODE CRIM. PROC. art. 51.13, § 4. Governor Abbott exercised that authority almost one month ago and is awaiting the Secretary's report.

That alone should dispose of Plaintiff's request for preliminary relief. The ripeness doctrine prevents federal courts from deciding disputes that are "premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). Although ripeness, like other justiciability doctrines, is derived from the limits placed by Article III of the United States Constitution on the power of federal courts, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), it is also drawn from "prudential reasons for refusing to exercise discretion," *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003). A case is not ripe "if further factual development is required," *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987), or "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas v. United States*, 523 U.S. 296, 300 (1998).

Minnesota's theory necessarily depends upon the presupposition of a future event: that Governor Abbott will deny its demand. Once the Secretary of State concludes his investigation, the Governor may conclude that the statutory requirements for extradition are satisfied, or he may conclude that they are not. Either way, Governor Abbott is entitled to see

that deliberative process through and is entitled to the presumption of regularity afforded to government acts. *See United States v. Chem. Found.*, 272 U.S. 1, 14 (1926). But until that process produces a decision, there is no gubernatorial refusal to review, nor any injury for it to remedy.

The Supreme Court case Minnesota harps on—*Puerto Rico v. Branstad*, 483 U.S. 219 (1987)—proves the point. There, the Governor of Puerto Rico requested the Governor of Iowa to extradite a man who had been arrested and charged with homicide in Puerto Rico, but who fled after being arraigned. *Id.* at 221. Despite stipulating "that the extradition papers fully complied with" all legal requirements, Iowa Governor Robert Ray "formally notified the Governor of Puerto Rico that . . . the request for extradition was denied" more than seven months after the request was made. *Id.* at 222–223. A model of patience, Puerto Rico then renewed its request to "to Governor Ray's successor in office, Respondent Terry Brandstad" and was denied again. *Id.* at 222. It was only after these (repeated) denials, despite stipulations that all prerequisites were met, that Puerto Rico sought and obtained relief in federal court.

Minnesota cannot absolve its own refusal to wait by pointing to Mr. Castro's possible release from preliminary detention. If Minnesota has any "constitutional and statutory rights" at all, Compl. ¶ 7,[3] it is only a right to have *proven* "fugitives" delivered "upon proper demand," *Branstad*, 483 U.S. at 226. It is not entitled to insist that a requestee Governor unthinkingly accept Minnesota's characterization or render a decision on the propriety of its demand within a set period of time. The UCEA nowhere prescribes a time limit for the

[3] The better view is that States do not possess "rights" like private individuals. That is why States cannot invoke the benefits of the Fifth Amendment, *South Carolina v. Katzenbach*, 383 U.S. 301, 323–324 (1966), and are not "persons" eligible to invoke the cause of action in 42 U.S.C. § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). As sovereigns, States have only *powers*—against which rights operate as privations—that may often be vindicated through diplomatic means or mediated as a last resort in our highest court. *Colorado v. Kansas*, 320 U.S. 383, 392 (1943) (eschewing "adjudicatory power" for interstate disputes).

requestee Governor to decide whether the Constitution's predicates have been met. *Infra* Part II.B. Nor do the Act's detention provisions limit the Governor by implication. Both speak to courts, not to Governors. One requires "the judge or magistrate" to detain an individual for thirty days. TEX. CODE CRIM. PROC. art. 51.13, § 15. The other allows "a judge or magistrate" to extend that detention for an additional period of up to 60 days. *Id.* art. 51.13, § 17. Neither restricts the authority of the Governor.

Whether Mr. Castro is a fugitive who triggers any mandatory extradition obligation is the very question Governor Abbott is endeavoring to determine. Minnesota may be frustrated about how long that process has taken. But it may not establish the necessary predicate facts by mere *ipse dixit*. Nor may it convert federal courts into roving supervisors of state executives endeavoring to dutifully ensure compliance with the Constitution. Minnesota may be content to rush out extradition warrants, heedless of whether the Constitution's prerequisites have been met, all while trusting to chance that the individuals concerned will not challenge those determinations via petitions for a writ of *habeas corpus*. But the Governor of Texas is not content with that slipshod approach to the constitutional rights of American citizens. This case is not ripe, and the Court should dismiss it entirely.

### B. Minnesota cannot show standing based entirely on speculative action by third parties.

To establish standing, a plaintiff must properly plead facts demonstrating "(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). With respect to the first requirement, "an injury in law is not an injury in fact." *Id*. at 427. A mere putative violation of law, therefore, does not " 'automatically satisf[y] the injury-in-fact requirement.' "

*Id*. at 423 (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340 (2016)). With respect to the second, injuries that are the " 'result of the independent action of some third party not before the court' " are not " 'fairly traceable' " to the defendant. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)) (alterations omitted).

Minnesota has no concrete injury at all. Its theory of harm rests on the false premise that if Mr. Castro is released when the period of preliminary detention expires, Minnesota will lose its opportunity to obtain his extradition. The UCEA says otherwise. The ninety-day period limits pre-warrant detention; it does not impose a ninety-day deadline on the Governor to approve or deny the demanding State's request. *In re Simpson*, 586 P.2d 1389, 1390 (Kan. Ct. App. 1978) (collecting cases). Minnesota's extradition rights therefore do not disappear merely because Mr. Castro is no longer subject to preliminary custody. *Ibid*. The warrant, when issued, carries the same legal authority whether issued before or after the ninety-day period expires. TEX. CODE CRIM. PROC. art. 51.13, §§ 8, 9. Once issued, it remains effective for one year, subject to the Governor's statutory authority to recall or reissue it. *Id*. art. 51.13, § 21. The UCEA thus contemplates issuance of a governor's warrant after the expiration of the statutorily authorized period of detention. And if the Governor deems it appropriate here, he may issue an extradition warrant for Mr. Castro at a later date.

And Minnesota's purported injury, in any event, is not caused by Governor Abbott. After all, the possibility of Mr. Castro's release is not a consequence unique to the Governor's failure to issue an extradition warrant. His release could occur at any time—yesterday, today, or two days from now. That is because the UCEA permits an accused person, with limited exceptions, to obtain release on bail pending issuance of the Governor's warrant. *Id*. art.

51.13, § 16.

Minnesota cannot cure these deficiencies by speculating that Mr. Castro will flee to Mexico if released. For one thing, that claim, based on Mr. Castro's fluency in Spanish and contact with a woman in Mexico, is unsupported by verified evidence. ECF No. 2 at ¶ 47. It is the *only* allegation in Minnesota's complaint made "[o]n information and belief." *Ibid*. That is insufficient. *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) (district courts should be weary of allegations made on information and belief). Minnesota's prediction of flight is rank speculation that is rightly disregarded, not relied on as evidence of a concrete and particularized harm.

For another thing, this theory of harm highlights how any injury is not imminent or traceable to the Governor. That is because Minnesota asks this Court to find standing based on the "highly speculative" intervening conduct of a third party—namely, Mr. Castro. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Mr. Castro is a federal law-enforcement officer and resident of Cameron County with ties to that community. After he was ordered to leave Minnesota, he spent more than three months in Texas before he was arrested on a Minnesota warrant. Compl. ¶ 3. He did not flee to Mexico during that time. Nothing in the record suggests that he made any effort to evade Minnesota, much less that he intends to flee to Mexico if released now.

Only the Governor of Minnesota would believe that a South Texas resident speaking Spanish and knowing somebody in Mexico by itself make it likely that a person will flee across the border to become an international fugitive, even though the same could be said of countless people living in the Brownsville Division. And only someone who does not understand what the border region is like would imagine that an ICE agent would find it safe

to flee into Mexico. That "highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

Accordingly, Minnesota lacks standing and its claims must be dismissed.

### C. Sovereign immunity bars this suit against the Governor of Texas for his efforts to comply with the Extradition Clause.

Minnesota has sued Governor Abbott "in his official capacity." Compl. ¶ 14. The Governor, as Chief Executive Officer of the State of Texas, is immune from suit in federal court twice over. As a matter of federal law, the Governor is entitled to both structural immunity and what is properly called Eleventh Amendment immunity. *See PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 509–511 (2021) (Gorsuch, J., dissenting).

To be sure, the constituent members of the Union may have consented to forgo their immunities from suit in disputes with one another, but they did so on the express condition that such cases would "be determined in the highest, rather than in a subordinate judicial tribunal of the nation." *United States v. Texas*, 143 U.S. 621, 643 (1892). The States, in other words, "agreed, in the Constitution" to forgo immunity from suit in interstate disputes, subject to the Supreme Court—the one tribunal "with authority to speak for all the people and all the States"—"exercis[ing] original jurisdiction in all such cases." *Id.* at 645–646; *see also Principality of Monaco v. Mississippi*, 292 U.S. 313, 328–329 (1934) (States "waived their exemption from judicial power" based on the Supreme Court being established as "a permanent tribunal with adequate authority to determine controversies between the States").

If Minnesota wishes to rely on Texas's consent to be sued pursuant to the plan of the constitutional convention, then it must honor *the terms* of such consent by suing in the Supreme Court. *See Texas*, 143 U.S. at 639–640 (collecting examples and noting they "were all original suits, in this court"); THE FEDERALIST No. 81 (Alexander Hamilton). It has not

done so. Instead, Minnesota elected to sue in federal district court. Accordingly, because Texas never consented to being sued by another sovereign government in federal district court, Minnesota must find a way around Texas's sovereign immunity. It cannot do so.

Minnesota may try invoking *Ex parte Young*, 209 U.S. 123 (1908). That will not work. First, *Ex parte Young* is "a narrow exception" to sovereign immunity rooted in federal preemption. *Whole Women's Health v. Jackson*, 595 U.S. 30, 39 (2021). The logic of the doctrine runs like this: State laws that conflict with federal law are preempted and unenforceable under the Supremacy Clause. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing U.S. CONST. art. VI, § 2, cl. 2). When such a conflict arises, a "void" state law thus provides no lawful authority to act. *Ex parte Young*, 209 U.S. at 159. Therefore, a state official who endeavors to implement that void state law performs "an illegal act" that "strip[s]" him "of his official or representative character." *Id.* at 159–160; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("The theory of [*Ex parte Young*] was that an unconstitutional enactment is 'void.'").

Minnesota nowhere argues that Governor Abbott is implementing a void state law that somehow conflicts with federal law. Far from it. In some instances, Minnesota even urges this Court to order Governor Abbott to comply with Minnesota's (mistaken) view of *Texas* law. *See* Compl. ¶¶ 22–27, 60–64. That is plainly prohibited by Supreme Court precedent. *Pennhurst*, 465 U.S. at 106. Governor Abbott, for his part, seeks to comply with federal and state law by assessing whether there is "direct and positive proof" of the facts necessary to exercise Extradition Clause power here. *Roberts*, 116 U.S. at 97. If Mr. Castro is not a fugitive, the Governor does not have a ministerial duty to do what Minnesota wants. *Hyatt*, 188 U.S. at 709; *infra* Part II.

Second, besides being triggered only by a particular legal violation not at issue here (preemption of state law), *Ex parte Young* also authorized only a particular kind of remedy that Minnesota does not seek (a prohibitory injunction). By acting *ultra vires*, so the *Ex parte Young* theory goes, a state official may lose his official status with respect to that act and can be ordered to stop. 209 U.S. at 158–160. But ordering him to take "affirmative" action *intra vires* is premised on the idea that he *retains* his "official or representative character." *Id.* at 160. Accordingly, "a suit may fail" if a party requests relief that "cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). In other words, *Ex parte Young* allows only a prohibitory injunction, but not a mandatory injunction ordering a state official to take official action. *See also Board of Liquidation v. McComb*, 92 U.S. 531, 541 (1875) (cited approvingly in *Branstad* and authorizing an injunction only "to prevent" "some positive official act" based upon "[a]n unconstitutional law").

Minnesota seeks exactly what *Ex parte Young* and *Larson* prohibit. Rather than trying to strip Governor Abbott of his official character, it seeks to compel him to undertake official action in his capacity as Governor. In its complaint, Minnesota prays this court to "[i]ssue a writ of mandamus to compel Defendant Governor Abbott to issue forthwith a governor's rendition warrant commanding that Defendant Sheriff Trevino and the Cameron County Sheriff's Office deliver Christian Castro to a duly authorized agent of the State of Minnesota for extradition." ECF No. 2 at 18. Because that is not permitted, Governor Abbott remains immune from this suit in its entirety.

### D. Nothing authorizes Minnesota to conscript federal courts into issuing writs of mandamus to state officers here.

Even if this Court could overlook the fact that this suit is not ripe, that Minnesota

lacks standing, and that Governor Abbott is immune from suit, Minnesota still cannot show that this Court has jurisdiction over Minnesota's claims. In its complaint, Minnesota prays for "a writ of mandamus to compel" Governor Abbott to issue an extradition warrant. But Minnesota has a problem: "Federal courts have no power to issue writs of mandamus to direct state officials in the performance of their duties." *Peters v. Davis*, No. CV H-18-3204, 2019 WL 127076, at *1 (S.D. Tex. Jan. 7, 2019) (Rosenthal, C.J.).

In 1938, when Federal Rules of Civil Procedure were first adopted, mandamus relief was expressly stripped from federal district courts. To this day, the Civil Rules continue to say that "[t]he writs of scire facias and mandamus are abolished." FED. R. CIV. P. 81(b). In 1962, Congress expressly conferred upon federal district courts a dose of mandamus authority, but only with respect to *federal* officers. Federal statutes now provide that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added). Accordingly, "Texas officials or employees are not subject to the mandamus power of a federal district court." *United Sovereign Americans, Inc. v. Nelson*, 762 F. Supp. 3d 523, 527 (N.D. Tex. 2025).

Minnesota points to no other source of law that can provide what is lacking. The only bases of jurisdiction cited in the complaint are 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Compl. ¶ 10. The former countenances "all civil actions arising under the Constitution, laws, or treaties of the United States." The latter refers to supplemental jurisdiction over related claims "in any civil action" of which the district court already has original jurisdiction. A petition for a writ of mandamus, however, is not a "civil action" within the meaning of these two primary jurisdictional statutes. That is why, as noted above, mandamus is referenced under a

different section that Minnesota never cites and which concerns a distinct "action in the nature of mandamus" cabined only to federal officers. *See also U.S. ex rel. Knapp v. Lake Shore & M.S.R. Co.*, 197 U.S. 536, 541 (1905) (providing that mandamus authority "cannot be inferred from the grant of authority" to enforce federal law).

Nor can Minnesota seek shelter in the All Writs Act. That statute authorizes federal courts to issue writs "in aid of their respective jurisdictions," but requires that jurisdiction first be established in some other way. 28 U.S.C. § 1651(b). As with a declaratory judgment, a court may issue appropriate mandamus relief if it has an independent basis of jurisdiction, *see, e.g.*, *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–260 (1957), but it may not entertain an original proceeding for a writ of mandamus as the vehicle for litigation. In other words, mandamus is "confined exclusively" and may issue only when "necessary to the exercise of" some other source of jurisdiction. *McIntyre v. Wood*, 7 Cranch (11 U.S.) 504, 506 (1813); *cf. Moye v. Clerk, DeKalb County Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973) (per curiam).

*Puerto Rico v. Branstad*, 483 U.S. 219, (1987), is not to the contrary. That decision held only that *Kentucky v. Dennison*, 24 How. (65 U.S.) 66 (1861), was overruled in a context where the requestee State "stipulated before the district court that the extradition papers fully complied with the requirements" for extradition—including that the individual concerned was a fugitive—but nevertheless refused to extradite. *Branstad*, 483 U.S. at 223. In light of that stipulation, the Iowa Governor had a "ministerial duty." *Id.* at 228. The Court never held that federal courts may claim for themselves a requestee State Governor's solemn "responsibility of determining . . . whether the individual is a fugitive" in the first place based on "competent proof." *Ex parte Reggel*, 114 U.S. 642, 651–652 (1885). Nor did it address the antecedent question of whether Congress gave district courts power to issue writs of mandamus against

state officials, as no party raised it. Such "drive-by" jurisdictional rulings, like implicit acquiescence in broad equitable relief, "have no precedential effect." *Steel Co.*, 523 U.S. at 91; *Trump v. CASA, Inc.*, 606 U.S. 831, 845 n.7 (2025).

Quite apart from whether Congress *could* authorize federal courts to issue mandamus relief to state officials consistent with the Constitution, it has never done so as a matter of statutory law. Accordingly, this "court lacks jurisdiction to entertain [Minnesota's] request for mandamus relief." *Peters*, 2019 WL 127076, at *1.

**E. The Supreme Court of the United States is the only appropriate venue for this dispute between two States.**

Finally, to the extent this sort of suit can be brought at all, it must be brought in the U.S. Supreme Court. The Constitution gives that Court original jurisdiction over suits between two States. U.S. CONST. art. III, § 2, cls. 1–2. Federal law makes that jurisdiction "original and *exclusive*." 28 U.S.C. § 1251(a) (emphasis added); *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992). The plaintiff in this case is "the State of Minnesota." Compl. ¶ 13. And it has sued the Governor of Texas in his official capacity, Compl. ¶ 14, who "represents the State" in litigation "where the State is a party, plaintiff or defendant." *Dennison*, 65 U.S. at 98. "Such exclusive jurisdiction was given to [the Supreme Court], because it best comported with the dignity of a State, that a case in which it was a party should be determined in the highest, rather than in a subordinate judicial tribunal of the nation." *Texas*, 143 U.S. at 643.

The Supreme Court, to be sure, has taken the view that it has discretion to decline review of such disputes. *See, e.g.*, *Branstad*, 483 U.S. at 223 n.1. But that view is wrong, as numerous Justices have explained in recent years. *See, e.g.*, *California v. West Virginia*, 454 U.S. 1027 (1981) (Stevens, J., dissenting from denial of motion for leave to file bill of complaint); *Louisiana v. Mississippi*, 488 U.S. 990 (1988) (White, J., dissenting from denial of motion for

leave to file bill of complaint); *Texas v. California*, 141 S. Ct. 1469 (2021) (Alito, J., dissenting from denial of motion for leave to file bill of complaint); *Alabama v. California*, 145 S. Ct. 757 (2025) (Thomas, J., dissenting from denial of motion for leave to file bill of complaint). Chief Justice Marshall once observed that the Supreme Court has "no . . . right to decline the exercise of jurisdiction which is given" and any claim to do to so "would be treason to the constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). Accordingly, Governor Abbott preserves this argument should the Supreme Court see fit to revisit it. *See J.W. v. Paley*, 81 F.4th 440, 448 n.21 (5th Cir. 2023).

## II. Minnesota Fails to State a Claim for Relief.

On the merits, Minnesota's arguments are doomed to fail. Across its pleadings, Minnesota hangs its hopes on one endlessly repeated refrain—*i.e.*, that Governor Abbott has "ministerial" duty to extradite Mr. Castro (and anyone else) on Minnesota's mere say-so. That is not the law. The Supreme Court has said the opposite. Especially when he is aware of evidence suggesting an individual may not be a fugitive within the meaning of the Constitution, a Governor has a solemn responsibility to determine for himself by factual proof whether the individual is subject to the Extradition Clause. Given that the text of the Constitution, Supreme Court precedent, and common sense all suggest that the act of fleeing requires a volitional departure from one State to another, preliminary evidence here suggests that Mr. Castro may not be a fugitive at all.

### A. Governor Abbott has a solemn obligation to determine whether all predicates are met to trigger the extradition power.

To state a successful claim for a writ of mandamus, Minnesota must establish that Governor Abbott owes a purely ministerial duty—"requiring no exercise of discretion"—to do what it asks. *McComb*, 92 U.S. at 541. But the very cases Minnesota cites establish that a

requestee Governor owes a ministerial duty only after receiving a "proper demand" to extradite an actual "fugitive." Compl. ¶ 16. Binding precedent on *that* question—whether the necessary predicates to triggering the Extradition Clause are met—assign this solemn obligation to the requestee Governor. Minnesota cannot write itself a blank check in a different governor's name. *See* Compl. ¶¶ 7, 18, 51 (conclusory assertions that Minnesota made a "proper" demand).

The Extradition Clause "has never been considered to be self-executing." *California v. Superior Ct. of Calif.*, 482 U.S. 400, 406 (1987). Congress adopted the Federal Extradition Act, 18 U.S.C. § 3182, to give effect to the Extradition Clause, and all but a few States adopted the UCEA to supplement it with procedural rules for extraditions. *Michigan v. Doran*, 439 U.S. 282, 288–289 (1978). In doing so, both Congress and the States intended extradition "to be a summary procedure" and for "extradition proceedings[] 'to be kept within narrow bounds.'" *California*, 482 U.S. at 407 (quoting *Biddinger v. Comm'r of Police,* 245 U.S. 128, 135 (1917)).

So, Minnesota is right that "[t]he Extradition Clause of the United States Constitution 'creates a mandatory duty to deliver up fugitives upon a proper demand.'" Compl. ¶ 16 (quoting *Branstad*, 483 U.S. at 227). But Minnesota unknowingly pleads its way into Governor Abbott's position in the very language it quotes from *Branstad*. Governor Abbott is entitled and obligated to determine whether Mr. Castro is a "fugitive" and thus whether Minnesota's demand is "proper" at all. More than 100 years of Supreme Court precedent establishes that "certain facts"—including whether the individual is a fugitive—"must appear before the governor has the right to issue his warrant." *Hyatt*, 188 U.S. at 709.

Accordingly, Supreme Court cases on the Extradition Clause predictably fall into one of two buckets. On the one hand are cases that concern a requestee Governor's threshold

determination about *whether* an individual is, in fact, a fugitive thus triggering the extradition obligation in the first instance. In some cases, the Supreme Court found that this prerequisite was met. *See, e.g.*, *Appleyard v. Massachusetts*, 203 U.S. 222, 226–227 (1906); *Bassing v. Cady*, 208 U.S. 386, 392 (1908). In others the Court found it was not. *See, e.g.*, *Hyatt*, 188 U.S. at 719. In still others, the Court suggested reasonable minds could disagree. *See, e.g.*, *Reggel*, 114 U.S. at 653. But one thing is common across all of these cases: The requestee Governor was authorized and duty-bound—"before he can lawfully comply with" the requisition demand—to make *his own* determination "that the person demanded is a fugitive from the justice" of the requesting State based on "direct and positive proof." *Roberts*, 116 U.S. at 95, 97.

On the other hand are cases where the extradition obligation *was* triggered, but the requestee State nevertheless refused extradition based on its own view of whether the individual should be punished. States, in these cases, impermissibly sought to: litigate for themselves the individual's likely guilt or innocence, *Pierce v. Creecy*, 210 U.S. 387, 403–405 (1908); question a sister State's authority to criminalize certain conduct, *Dennison*, 65 U.S. at 68–69; or cast aspersions on the quality of judicial proceedings in another State, *Branstad*, 483 U.S. at 222. Across all these cases, it is clear that the requesting State's documents "are clothed with the traditional presumption of regularity." *Doran*, 439 U.S. at 289–290.

Governor Abbott has never claimed that second-degree assault or falsely reporting a crime in Minnesota are not qualifying offenses, that Mr. Castro should not be punished for any such criminal conduct, or that Minnesota courts are somehow inadequate to test Mr. Castro's guilt or innocence. It may be that Mr. Castro violated Minnesota's criminal laws. It may be, as well, that he should face federal criminal charges. But none of that is the question at hand. Instead, Governor Abbott is fulfilling his threshold "responsibility" under the

Constitution to determine "by competent proof" whether "the accused is, in fact, a fugitive" after "opposing evidence was brought to his attention." *Reggel*, 114 U.S. at 652–653.

Because the Supreme Court says that question of *fact* is assigned to the requestee Governor as a matter of *law*, Minnesota's claim that it is entitled to grade its own homework is legally deficient on its face.

### B. The obligation to determine predicate facts is not ministerial, as evidenced by a century of practice and precedent.

Next, the duty that Governor Abbott *does* owe—to "decide, upon such evidence as he may deem satisfactory," whether "the person demanded is a fugitive"—is not ministerial at all. *Roberts*, 116 U.S. at 95. It "is a question of fact, which the governor of the state upon whom the demand is made must decide, upon such evidence as he may deem satisfactory." *Ibid.* When determining facts as "a condition precedent" to the extradition obligation being triggered in the first place, *Reggel*, 114 U.S. at 652, no "mandatory" and "ministerial" duty to extradite can possibly have sprung into being, *Mississippi v. Johnson*, 71 U.S. 475, 498 (1866). This task, in other words, is not a mere checking of boxes by Minnesota, but rather a discretionary factfinding function by Governor Abbott. And "[i]t is conceded that . . . a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter." *McComb*, 92 U.S. at 541.

Consider, for example, the numerous Supreme Court statements describing the need for "evidence" and "positive proof" to demonstrate fugitive status. *See, e.g.*, *Hyatt*, 188 U.S. at 710; *Roberts*, 116 U.S. at 97; *Appleyard*, 203 U.S. at 226. Sometimes this evidence was taken on the papers, including by affidavit. Other times it may have been gathered in live testimony in extradition hearings before a Governor's office. Or facts may be gathered by another agency within the executive branch. Because "the statute . . . does not prescribe the character of such

proof" needed to establish fugitive status, *Reggel*, 114 U.S. at 651, the Governor has some flexibility in determining how to receive "such evidence as he might deem satisfactory" to discharge his constitutional obligations, *Hyatt*, 188 U.S. at 710.

That is why state law expressly creates a mechanism for the Governor to investigate certain facts as a predicate to any extradition obligation. As explained above, in light of public reports suggesting that Mr. Castro was ordered by the federal government to leave Minnesota and return to Texas, Governor Abbott has called upon the Texas Secretary of State pursuant to Article 51.13, Section 4 of the Texas Code of Criminal Procedure to investigate whether Mr. Castro is a fugitive. Both Governor Walz and Attorney General Ellison should find this statutory tool familiar. After all, Minnesota law contains a nearly identical provision, authorizing Governor Walz to "call upon the attorney general" to investigate a requisition demand and to report on "whether the person ought to be surrendered." MINN. STAT. § 629.04. If a requestee Governor's duty was purely ministerial, with no room for independent judgment, these provisions would make little sense.

Another indicator that this process is not a mere trifle is the fact that its output grounds real legal consequences in later disputes. After a Governor issues an extradition warrant, four issues may be impeached in a petition for a writ of *habeas corpus* by the defendant: (a) whether the extradition documents on their face are in order; (b) whether the defendant has been charged with a crime in the demanding State; (c) whether the defendant is the person named in the request for extradition; and (d) whether the defendant is a fugitive. *Doran*, 439 U.S. at 289; *Alabama ex rel. Governor & Atty. Gen. v. Engler*, 85 F.3d 1205, 1208 (6th Cir. 1996).

But "[i]f it be determined that the alleged criminal is a fugitive from justice, whether such determination be based upon the requisition and accompanying papers in proper form,

or after an original, independent inquiry into the facts, and if a warrant of arrest is issued after such determination, the warrant will be regarded as making a *prima facie* case in favor of the demanding state, and as requiring the removal of the alleged criminal to the state in which he stands charged with crime, unless, in some appropriate proceeding, it is made to appear that he is not a fugitive from the justice of the demanding state." *People ex rel. McNichols v. Pease*, 207 U.S. 100, 109 (1907). A requestee Governor's determination creates a "rebuttable presumption" in subsequent proceedings. *Doran*, 439 U.S. at 293 n.3 (Blackmun, J., concurring in result). That determination is treated as an event of legal significance precisely because it is not just a rubber stamp of whatever the requesting State sent over.

These are not perfunctory tasks. The Governor has a duty to protect the rights of Texans by ensuring the "essential elements" of the UCEA are "strictly followed." *U.S. ex rel. McCline v. Meyerling*, 75 F.2d 716, 717 (7th Cir. 1934). "Only by faithfully following the provisions of this statute may a person be lawfully deprived of his liberty and extradited from an asylum state to another state, there to be tried for the commission of a crime." *Ibid*. As a matter of law, Minnesota cannot ground mandamus relief on the requestee Governor's performance of the inherently discretionary act of executive fact-finding.

**C. Minnesota has not pled non-conclusory facts sufficient to show Mr. Castro is a fugitive within the meaning of the Constitution.**

Even assuming Minnesota could claim for itself Governor Abbott's discretionary duty to find facts concerning fugitivity (it cannot), Minnesota makes no non-conclusory allegations about Mr. Castro's fugitive status. It was incumbent on Minnesota to plead non-conclusory facts sufficient to show as a matter of law that Mr. Castro qualifies as a fugitive whose flight triggers a mandatory duty to extradite. Minnesota did no such thing, presumably because it never stopped to think about the fugitivity requirement at all.

In its complaint, the allegations concerning fugitivity consist of entirely this: Mr. Castro committed an act in Minnesota, Compl. ¶ 2, and he was later found in Texas, Compl. ¶ 35. In other words, Minnesota suggests Mr. Castro is a fugitive simply because he was (1) charged with a crime in Minnesota and (2) was later found elsewhere. Those allegations are legally deficient on their face, because the Extradition Clause requires that an individual (1) be "charged" with a crime, (2) "be found" elsewhere, and (3) have "fle[d]" there.

Start with the Constitution's text. Article IV, Section 2, Clause 2 says that the extradition authority applies only to "[a] Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State." One takeaway jumps off the page immediately. Namely, it is insufficient that the individual concerned is merely "found in another State" after having been in the State where the crime was allegedly committed. That's because the restrictive relative clause that begins with "who shall . . ." has a conjunctive structure: It is built around the word "and" points to two, distinct requirements. *See, e.g.*, *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) ("The requirements are connected by the conjunctive 'and,' meaning defendants must meet all three."). In other words, the individual must be found elsewhere *and* he must have fled there.

But Minnesota offers no allegations—not even conclusory ones—that Mr. Castro fled, perhaps because Minnesota thinks it suffices that Mr. Castro was later found in a different State. *See, e.g.* Minnesota Reply in Support of TRO at 17 (arguing it is "sufficient to establish that Castro is a fugitive" that he "was present in Minnesota" and later "was arrested in Texas"). That is wrong. Flight is an independent requirement, and Minnesota has pled it nowhere. This aspect of the complaint is legally deficient, all by itself and entirely independent of how this Court thinks the concept of flight *should* be defined.

It is worth stressing that as the defendant, Governor Abbott does not have to show that Mr. Castro is *not* a fugitive. He has not made a decision one way or another. Minnesota's rush to bring this suit while Governor Abbott continues to investigate the circumstances surrounding Mr. Castro's movement, however, has forced him to express some tentative views. While that analysis is necessarily preliminary, public reporting and a preliminary investigation suggest that Mr. Castro may not be a qualifying fugitive within the meaning of the Extradition Clause.

As seen above, the phrase "who shall flee from Justice" must carry its own meaning. One aspect of that meaning inheres in the verb the framer's chose to employ. To "flee" necessarily requires an act of volition, not involuntary movement. *See Flee*, WEBSTER'S NEW COLLEGIATE DICTIONARY 316 (1949) ("To run away or escape from"); *Fugitive*, WEBSTER'S NEW COLLEGIATE DICTIONARY 335 (1949) ("One who flees from pursuit, danger, service, etc."). That is why it makes little sense to say of someone: "He accidentally fled from the crowd's watchful gaze." *Cf. Voisine v. United States*, 579 U.S. 686, 692–693 (2016) (holding the meaning of the phrase "use of force" "must be volitional; an involuntary motion, even a powerful one, is not naturally described as an active employment of force").

Analogous criminal laws provide helpful guidance, too. Congress has made it a federal crime to do that which triggers the Extradition Clause: "Whoever moves or travels in interstate or foreign commerce with intent . . . to avoid prosecution . . . under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the laws of the place from which the fugitive flees, . . . shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1073. Not long after its enactment, the Supreme Court read this law as penalizing "*voluntary* flight" by

a defendant who "*elected* to flee." *Michel v. Louisiana*, 350 U.S. 91, 98–99 (1955) (emphases added); *see also United States v. Frank*, 864 F.2d 992, 1006 (3d Cir. 1988) ("To prove such a violation the government must prove that the defendant willfully moved or traveled in interstate or foreign commerce with the intent to avoid a state prosecution."). It would be odd if involuntary movement across state lines could make one liable for a federal felony.

To be sure, the Supreme Court has read the Extradition Clause's "who shall flee" phrase broadly in other respects. For example, it is not necessary that the individual should have been charged before he flees. *See Roberts*, 116 U.S. at 97. It suffices that he flees after the underlying criminal episode, regardless of when he is ultimately "charged" with a crime. Likewise, the Supreme Court has said it does not matter whether the individual's purpose in fleeing was to evade criminal liability. *See Bassing*, 208 U.S. at 392. Whether he fled to avoid the constable or to visit an ailing relative, the fugitive made a voluntary decision to depart while knowing he still had business with a sovereign government whose laws he flouted.

Even so, across numerous cases, the Supreme Court continually recognized the need for the act of flight to be volitional, even if the reasons motivating that act were less important. In *Appleyard*, for example, the Court stressed that the individual must " 'withdraw[] himself from such jurisdiction without waiting to abide the consequences of such act' " in order to be considered a fugitive. 203 U.S. at 231 (quoting *In re Voorhees*, 32 N.J.L. 141, 150 (1867)). It should not suffice that he be withdrawn by someone else. So, too, in *Hyatt*, the Court stressed the "plain meaning" of fleeing and quoted the Extradition Act's repeated emphasis on the volitional act of flight. 188 U.S. at 712–713 (noting focus on the State "*to which such person has fled*" and the State "*from whence the person so charged has fled*" (emphases original)). "It is difficult to see how a person can be said to have fled from the State," the Court observed, "when in

fact he was not within the State at the time the act is said to have been committed." *Id.* at 713.

It is likewise difficult to see how a federal officer can be said to have fled from one State when he is ordered by the federal government to return to his official duty station in another. Flight by a fugitive requires a volitional act by the individual, not an act forced upon him by a sovereign government. Minnesota has pled no facts showing Mr. Castro voluntarily fled its jurisdiction. Simply declaring him to be a "fugitive" is *legally* insufficient.

Although the Governor is still awaiting a formal report from the Secretary of State, public reporting and a preliminary investigation indicated that Mr. Castro was, in fact, ordered by DHS to return to his duty station in Texas. Needless to say, it would present a constitutional problem of a different magnitude if a State could create *additional* liability for a federal officer who moved from one State to another because he was ordered to do so by the federal government. Intergovernmental immunity, to be sure, is not unlimited. *See Texas v. DHS*, 123 F.4th 186, 205–209 (5th Cir. 2024) (holding federal immigration agents had no intergovernmental immunity from state tort liability for wanton destruction of state property to facilitate illegal immigration). But it may provide one more reason to hesitate before approving a State to declare federal officers to be "fugitives" simply for complying with federal orders.

On a preliminary view, it appears that Mr. Castro is in Texas on the orders of the federal government. As the Governor's investigation is ongoing, he cannot divulge the details of ongoing deliberations. But that investigative process, expressly provided for in the UCEA, is entitled to a presumption of regularity until the Governor sees it through to completion. That is especially so given Minnesota's own admission that Governor Abbott routinely discharges his responsibilities under the Extradition Clause faithfully. Compl. ¶¶ 28–32.

On this score, however, Minnesota has nothing to say. It does not plead that Castro fled—one of the predicate facts necessary to prove fugitivity—at all. That determination, in any event, is assigned to Governor Abbott: He must "decide, upon such evidence as he may deem satisfactory"—not upon Minnesota's insistence, nor upon its efforts to hijack that executive factfinding by judicial decree—whether "the person demanded is a fugitive." *Roberts*, 116 U.S. at 95 (emphasis added). And he must do that "before he can lawfully comply with" a requisition demand.

## CONCLUSION

The Court should grant this motion and dismiss Minnesota's claims in their entirety.

DATE: August 25, 2026

Respectfully submitted,

/s/ Trevor W. Ezell
TREVOR W. EZELL
*Attorney-in-Charge*
General Counsel
Texas Bar No. 24109849
S.D. Tex. Bar No. 3942308
Trevor.Ezell@gov.texas.gov

JASON T. BRAMOW
Deputy General Counsel
Texas Bar No. 24101545
S.D. Tex. Bar No. 3134903
Jason.Bramow@gov.texas.gov

MATTHEW ERICKSON*
Special Counsel
Texas Bar No. 24134310
Matthew.Erickson@gov.texas.gov
**Application for admission forthcoming*

Office of the Governor
P.O. Box 12428
Austin, Texas 78711
(512) 643-1788

*Counsel for Greg Abbott, in his official capacity as Governor, on behalf of the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the 25th day of August, 2026, upon all parties who have entered an appearance, using the CM/ECF system.

/s/ Trevor W. Ezell
TREVOR W. EZELL
General Counsel
Office of Governor Greg Abbott