United States District Court
Southern District of Texas
**ENTERED**
August 26, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TIM WALZ, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:26-CV-906 |
| | § | |
| GREG ABBOTT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

In January 2026, Christian Castro, in the course of his duties as an agent for United States Immigration and Customs Enforcement, discharged his firearm through the closed door of a home into which an individual he had been pursuing had entered. Castro's shot injured one person in the leg.

In May, the State of Minnesota charged Castro with various crimes based on that incident. By the time these charges arose, however, Castro was no longer in Minnesota, leading a county judge to issue a nationwide warrant for his arrest. When authorities in the State of Texas arrested Castro in late May, Minnesota Governor Tim Waltz initiated the process under the Extradition Act of 1793 and the Uniform Criminal Extradition Act to secure Castro's extradition to Minnesota.

Under the UCEA, Castro can be detained on the strength of the Minnesota warrant only until August 27, 2026. As the day approached, and fearing that Castro will flee into Mexico should he be released, Minnesota made repeated inquiries of Texas regarding the status of the extradition request. On August 18, having not received a definitive answer, Minnesota filed this action, alleging that Governor Abbott "has refused" to sign a rendition warrant, violating the Extradition Clause of the United States Constitution, the Extradition Act, and the UCEA.

Minnesota moves for a temporary restraining order to avoid Castro's release before Governor Abbott signs a rendition warrant. On August 25, the Court held a hearing on the request.

Based on the record and the applicable law, the Court concludes that Minnesota fails to satisfy the requirements for the issuance of a temporary restraining order.

## I. Factual Background and Procedural History

On January 14, 2026, ICE agent Castro took part in an enforcement effort in Minnesota that ended with Castro firing a single shot from his firearm through the front door of a home, injuring one individual. Based on this incident, on May 18, 2026, authorities in Hennepin County, Minnesota charged Castro with four felony counts of second degree assault and one misdemeanor count of falsely reporting a crime. The same day, a Hennepin County Judge issued a nationwide warrant for Castro's arrest.

On May 29, authorities in Cameron County, Texas arrested Castro on the strength of the Minnesota warrant and booked him into the Cameron County Jail. The Booking Report reflects that Castro was "pending extradition[.]" (Booking Report, Doc. 8–3, 9)

On June 2, Governor Walz formally requested Castro's extradition by sending a package of documentation to Governor Abbott, in accordance with the Extradition Act and the UCEA. The documents included certified copies of the charging instruments and evidence to support the charges, as well as identifying information as to Castro.

On June 4, Castro appeared before a Cameron County Judge, who informed Castro of the extradition request and initially denied bond, although later the judge granted Castro the ability to post a $200,000 bond to secure his release. Castro has neither posted bond nor waived his rights regarding extradition. He remains in custody in Cameron County.

Starting in early June, Minnesota repeatedly inquired with Texas officials regarding the status of Castro's extradition. Over the past year, Minnesota has presented multiple extradition

requests to the State of Texas. In most instances, Texas Governor Greg Abbott has signed the rendition warrant within weeks of receiving the request.

On July 30, Hennepin County Attorney Mary Moriarty sent a letter to Governor Abbott urging him to issue the rendition warrant and noting that over two months had elapsed since Castro's arrest. The next day, Governor Abbott requested that the Texas Secretary of State "investigate [the extradition] demand and report to me concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." (Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac) In particular, Governor Abbott expressed "serious doubts that the prerequisites for extradition have been met" because of "information indicating that Mr. Castro was compelled to return to Texas on orders of the federal government." *Id.*[1] The record contains no information indicating that Minnesota was aware of Governor Abbott's request for an investigation by the Secretary of State. When Minnesota officials followed up on the matter, Texas representatives responded that the matter remained pending.

On August 18, the State of Minnesota, acting on behalf of Governor Tim Walz and Attorney General Keith Ellison, filed its Complaint and accompanying motion for a temporary restraining order. Minnesota argues that absent injunctive relief, Castro "may be eligible for release from custody as soon as August 26, 2026[,]" and that following such release, Castro may flee to Mexico, where "it may take months or even many years for the extradition request to be heard by the [Mexican] courts and for the executive authority [in Mexico] to make a surrender decision." (Mem. in Support, Doc. 8–1, 3, 16)

In support of its position that Castro represents a flight risk, Minnesota submits evidence that while incarcerated, Castro has held regular and repeated phone calls with a woman who lives in Progreso, Mexico. (Minvielle Decl., Doc. 22–2, ¶ 5 ("[M]any of his calls are with a woman . . .

[1] The Department of Justice has confirmed that on January 15, 2026, ICE leadership ordered Castro to return to Texas. (Statement of United States, Doc. 21, 2)

who is his romantic partner.")) In those calls, Castro has expressed a desire to purchase property in Mexico and move there in the future. Castro did not disclose this relationship or prior trips to Mexico on a federal employment form which requires the disclosure of such information.

On August 25, the Court held a hearing on the motion for temporary restraining order. At the hearing, counsel for Sheriff Manuel Trevino represented that absent a court order or the issuance of a rendition warrant by Governor Abbott, Castro would be released on August 27.

## II. Analysis

Minnesota asks the Court to issue a temporary restraining order "compel[ling] Defendant Texas Governor Greg Abbott to execute a rendition warrant for Christian Castro's extradition forthwith, and [ ] enjoin[ing] Defendant Cameron County Sheriff Manuel Trevino . . . from releasing Christian Castro from custody until Defendant Texas Governor Greg Abbott has executed a rendition warrant and Castro is transferred to Plaintiff's agents for extradition." (Motion, Doc. 8, 3)

Federal Rule of Procedure 65 governs the issuance of temporary restraining orders. A party seeking such relief must establish four elements:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quoting *Concerned Women for Am., Inc. v. Lafayette Cty.*, 883 F.2d 32, 34 (5th Cir. 1989)). "The third and fourth factors—balance of harm and public interest—merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024). Emergency injunctive relief represents an extraordinary remedy, *see Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987), and the moving party must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

### A. Substantial Likelihood of Success on the Merits

"A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (quoting *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n. 34 (5th Cir. 2003)).[2] "Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits[.]" *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017); *see also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995)) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.").

A successful jurisdictional challenge by a defendant defeats the request for a temporary restraining order. *See, e.g., Tex. Med. Ass'n v. Sullivan*, 875 F.2d 1160, 1170 (5th Cir. 1989). (reversing the granting of a preliminary injunction because the district court lacked subject matter jurisdiction).

#### 1. The Interstate Extradition Process

Here, Minnesota alleges three causes of action, based respectively on the Extradition Clause of the United States Constitution (U.S. CONST., art. IV, § 2, cl. 2), the Extradition Act of 1793 (18 U.S.C. § 3182), and the Uniform Criminal Extradition Act ("UCEA") (codified at Texas Code Criminal Procedure, article 51.13). These authorities create a procedure for the interstate extradition of individuals charged with criminal conduct, but who are fugitives from the state in which they stand accused.

[2] As a general matter, the requirements for a temporary restraining order mirror those applicable to the issuance of a preliminary injunction. *See, e.g.,* 11A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.) ("With the emphasis that the temporary restraining order is intended to prevent immediate irreparable harm, courts ordinarily apply the same four-part standard used in the preliminary injunction context.").

The Extradition Clause of the United States Constitution establishes this right, providing that a "person charge in any state with [a] felony, . . . who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." U.S. CONST. art. IV § 2 cl. 2. The Extradition Clause represents a "limit[ ] on the sovereign powers of the States[.]" *California v. Superior Court of California, San Bernardino Cnty.*, 482 U.S. 400, 405 (1987). "The obvious objective of the Extradition Clause is that no State should become a safe haven for the fugitives from a sister State's criminal justice system." *Id.* at 406. "Its mandatory language furthers its intended purpose: 'to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed,' and 'to preclude any state from becoming a sanctuary for fugitives from justice of another state.'" *Puerto Rico v. Branstad*, 483 U.S. 219, 227 (1987) (quoting *Michigan v. Doran,* 439 U.S. 282, 286 (1978)). Under this constitutional provision neither "executive officers [nor] courts of the asylum State" possess discretion to deny a proper extradition request. *Branstad*, 483 U.S. at 227. Indeed, federal courts are vested with the power to direct state officials to comply with the Extradition Clause. *Id.* at 222–30.

The Extradition Clause, however, is not self-executing and "does not specifically establish a procedure by which interstate extradition is to take place[.]" *California*, 482 U.S. at 406. As a result, Congress passed the Extradition Act of 1793, 18 U.S.C. § 3182. Under the statute's prescribed process, the governor of a state may "demand[ ] any person as a fugitive from justice, of the [governor] of any State . . . to which such person has fled[.]"[3] 18 U.S.C. § 3182. To make such a request, the governor of the demanding state must provide the governor of the asylum state a certified copy of the indictment or affidavit "charging the person demanded with having committed" a felony. *Id.* The governor of the asylum state "shall cause [the accused individual] to be arrested and secured, and [shall] notify the [governor] making such demand, or the agent of

[3] The statute references the "executive authority" of the states involved. With respect to Texas and Minnesota, Governor Abbott and Governor Waltz represent the executive authority of his respective state.

such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear." *Id.*

Congress intended interstate extradition under these authorities "to be a summary procedure." *California*, 482 U.S. at 407. When a governor in an asylum state receives an extradition request, the Extradition Act "leaves only four issues open for consideration before the fugitive is delivered up:"

> (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive.

*Id.* at 408 (citing *Doran*, 439 U.S. 282, 289)).

In conjunction with the Extradition Clause and Extradition Act, many states, including Texas and Minnesota, have adopted the Uniform Criminal Extradition Act ("UCEA"). *See, e.g.*, TEX. CODE CRIM. P. art. 51.13. The statute provides additional procedural mechanisms to facilitate the interstate extradition of fugitives, and includes protections for accused individuals. For example, the UCEA forbids a governor from recognizing an extradition request unless the demanding state makes certain allegations in writing, including "that the accused was present in the demanding State at the time of the commission of the alleged crime, and that thereafter he fled from the State[.]" *Id.* at § 3. The demanding state must also include a copy of the charging document, and the charging document "must substantially charge the person demanded with having committed a crime under the law of that State[.]" *Id.* The statute also authorizes the governor of the asylum state to "call upon the Secretary of State, Attorney General or any prosecuting officer in [the state] to investigate or assist in investigating the demand, and to report to him the situation and circumstances of the person so demanded, and whether he ought to be surrendered. *Id.* at § 4. Ultimately, "[i]f the Governor decides that the demand should be complied with, he shall sign a warrant of arrest [the "rendition warrant"], which shall be sealed with the state seal and be directed to any peace officer or other person whom he may think fit to entrust

with the execution thereof. The warrant must substantially recite the facts necessary to the validity of its issuance." *Id.* at § 7.

The UCEA also limits the time period during which an individual may be detained based on an extradition warrant from the demanding state. "A fugitive not arrested under a warrant from the Governor of this State before the expiration of ninety days from the day of his commitment or the date of the bail shall be discharged." TEX. CODE CRIM. P. art. 51.07. In addition, the parties agree that an arrested fugitive may be afforded the opportunity to post bond during this 90-day period.

### 2. Subject Matter Jurisdiction

In addition to contesting that Minnesota can prevail on the merits of any of its claims, Texas presents various threshold arguments challenging the jurisdiction of the Court to consider this lawsuit. As an initial argument, Texas contends that the Court lacks subject matter jurisdiction because "Governor Abbott has not refused [Minnesota's] extradition demand[,]" and no statute imposes a "set period of time" in which Governor Abbott must sign the rendition warrant. (Texas Resp., Doc. 20, 15, 17) In short, Texas claims that Minnesota's lawsuit is not ripe.

The doctrine of ripeness concerns "whether a dispute has yet matured to a point that warrants decision." 13A Wright & Miller, § 3532. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up) (quoting *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 580–581). Courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967); *see also Placid Oil Co. v. Federal Energy Regul. Comm'n,* 666 F.2d 976, 981 (5th Cir. 1982). Typically, a case is ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required. *Thomas*, 473 U.S. at 581.

Based on the current record, the Court concludes that it lacks subject matter jurisdiction because the case is not ripe for adjudication.

Minnesota's lawsuit necessarily rests on the argument that Governor Abbott has violated the Extradition Clause, the Extradition Act, or the UCEA by having failed to sign a rendition warrant by now. Minnesota cannot premise its causes of action on the allegation that Governor Abbott *may* violate those authorities in the future; it must prove that a violation has already occurred. Otherwise, Minnesota would be impermissibly seeking relief based solely on a premature or speculative allegation about possible future events—i.e., that Governor Abbott will wrongfully deny the request for extradition.

The record before the Court, however, reveals that Governor Abbott has not denied the request for a rendition warrant. Minnesota alleges that Governor Abbott has "refused to sign" and has "with[eld]" the rendition warrant. But the record reflects only that Governor Abbott has neither agreed nor refused to sign the rendition warrant as to Castro. Instead, Governor Abbott has requested that the Texas Secretary of State "investigate [Minnesota's] demand and report to [the Governor] concerning Mr. Castro's situation and circumstances and whether he ought to be surrendered." (Letter from Greg Abbott, Governor of Texas, to Robert Howden, Secretary of State (July 31, 2026), *available at* Legislative Reference Library of Texas, https://tinyurl.com/mannweac). The UCEA expressly authorizes Governor Abbott to take this step, *see* TEX. CODE CRIM. P. art. 51.13 § 4, and the Secretary of State has not yet reported back regarding the investigation. As a result, Governor Abbott has not determined whether to sign the rendition warrant.

Minnesota's position would succeed only if the Extradition Clause, Extradition Act, or UCEA required Texas to act on the request for a rendition warrant within a specified time period that has already elapsed. Under those circumstances, Governor Abbott's failure to act within the time period would amount to a violation of the constitutional and statutory authorities and would

present an issue ripe for adjudication. But on this point, neither the Extradition Clause nor either statute at issue contains such a requirement. Minnesota's argument effectively asks the Court to impose into the Extradition Clause, the Extradition Act, and the UCEA a deadline for a state governor to sign a rendition warrant or decline to do so. The Court is unaware of any authority supporting the creation of a court-imposed deadline under these circumstances.

Minnesota contends that Texas has uncharacteristically and unnecessarily delayed consideration of the issue, presenting evidence that in most cases, Governor Abbott has signed rendition warrants within a few weeks of Minnesota's request. In contrast, as to Castro, Governor Abbott waited almost two months after receiving Minnesota's extradition demand before requesting an investigation by the Texas Secretary of State, doing so only after Hennepin County Attorney Moriarty submitted an additional formal request to complete the extradition. And on the eve of Castro being released under Texas law, Governor Abbott contends that he requires more time to vet whether Castro is a fugitive. No party disputes this chronology of events, and the Court accepts that Governor Abbott has considered this particular extradition request for an atypically-long duration. Nevertheless, Minnesota identifies no statutory or constitutional provision requiring Governor Abbott to complete his investigation and decide whether to sign the rendition warrant within a particular time period.

In addition, ample caselaw supports Governor Abbott's decision to investigate whether Castro is a fugitive for purposes of the Extradition Clause and the statutes. More than one hundred years ago, the Supreme Court explained that when a governor receives a request for the extradition of an accused individual, "[c]ertain facts . . . must appear before the governor has the right to issue his warrant." *Hyatt v. People of State of New York*, 188 U.S. 691, 709 (1903). In particular, the governor must ensure "that the person demanded is substantially charged with a crime against the laws of the state from whose justice he is alleged to have fled, by an indictment or an affidavit, etc., and that the person demanded is a fugitive from the justice" of the demanding

state. *Id.* In the present case, Governor Abbott expressly requested that the Secretary of State investigate whether Castro is a fugitive, a determination that *Hyatt* and other authorities expressly dictate that a governor not only may, but must consider.[4]

Minnesota raises the concern that Texas's construction of the Extradition Clause and the related statutes permits an asylum state to thwart the purpose of these authorities by investigating a demand for extradition indefinitely. On this point, the Court does not reach whether circumstances could arise when an asylum state's prolonged delay in the investigation of an extradition demand would constitute the constructive denial of the demand, so as to create an issue ripe for adjudication. The record in the present matter does not present such circumstances. Governor Abbott requested an investigation by the Texas Secretary of State about 60 days after receiving Minnesota's extradition demand. The record contains no direct evidence indicating that Governor Abbott made this request for the purpose of delay, or that the investigation will continue for a prolonged period. The threat of an indefinite consideration of Minnesota's extradition request does not currently exist.

Minnesota also argues that Sheriff Trevino will release Castro on August 27, 2026, and that upon his release, Castro may flee the country, which would significantly hinder Minnesota's efforts to prosecute its case against him. The Court agrees that Castro's flight to Mexico would

[4] The Court has doubts that caselaw supports the construction of "fugitive" that Texas is considering. According to Texas, it is investigating whether, in the context of interstate extradition, a fugitive is a person who volitionally leaves the state in which he is charged. Here, Texas proposes, Castro did not leave Minnesota volitionally, but did so in response to a directive from ICE, his employer. But as the Supreme Court long ago explained, a fugitive is a person who, "having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offense, he has left its jurisdiction, and is found within the territory of another." *Roberts v. Reilly*, 116 U.S. 80, 97 (1885). Under this rubric, the focus rests not on the accused's reason for leaving the state, but simply on whether he in fact left. Consistent with this broad construction of "fugitive," cases that have concluded that an individual was not a fugitive all involved persons who were not within the state demanding extradition when the alleged offense occurred. *See, e.g.*, *Hyatt v. New York*, 188 U.S. 691 (1903); *Fowler v. Ross*, 196 F.2d 25, 35 (D.C. Cir. 1952); *Moncrief v. Anderson*, 342 F.2d 902 (D.C. Cir. 1964). And in one case, a circuit court concluded that a prisoner transferred by state custodial authorities from Kansas to Wyoming became a fugitive from Kansas for purposes of extradition. *Gee v. Kansas*, 912 F.2d 414, 419 (10th Cir. 1990) ("Once petitioner *was moved* outside Wyoming State boundaries, he became a fugitive from justice within the meaning of 18 U.S.C. § 3182.") (emphasis added). The transferred individual in *Gee* made no more of a volitional act to leave Kansas than Castro did to leave Minnesota. But the Tenth Circuit still concluded that the accused was a fugitive for purposes of interstate extradition.

impose a hardship on Minnesota's prosecutorial efforts. But that possible outcome does not alter the analysis. At most, the impending release and potential flight by Castro supports Minnesota's showing of irreparable injury, for purposes of the second prong of the Rule 65 analysis. But the threat of irreparable injury does not obviate the need for Minnesota to demonstrate that it has a substantial likelihood of success on the merits of at least one of its causes of action. And the threat of injury by itself does not create an issue ripe for adjudication.

Effectively, Minnesota requests that the Court impose the 90-day detention limit within Articles 51.05 and 51.07 of the Texas Code of Criminal Procedure as the outer limit for Texas's consideration of Minnesota's extradition request. If Texas fails to act within those 90 days, Minnesota contends, a federal district court should step into Texas's shoes, review the extradition request, and order the governor of the state to sign the rendition warrant. But as previously explained, the Court finds no authority supporting the creation of a deadline for a governor's permissible investigation under the Extradition Clause and Extradition Act.[5]

For these reasons, the Court concludes that this matter does not present an issue ripe for adjudication. As a result, Minnesota fails to demonstrate a substantial likelihood of success on the merits of any of its causes of action. And this failure defeats its request for a temporary restraining order.[6]

### B. Remaining Factors

The Court's conclusion as to subject matter jurisdiction renders it unnecessary to reach the parties' other arguments or to consider the remaining prongs of the Rule 65 analysis.

[5] Alternatively, Minnesota requests that the Court order Sheriff Trevino to not release Castro until Governor Abbott has signed a rendition warrant. For the reasons stated on the record at the August 25 hearing, the Court concludes that no grounds support a temporary restraining order requiring Sheriff Trevino to ignore the dictates of Texas Code of Criminal Procedure Articles 51.05 and 51.07. No party challenges the validity of those statutory provisions, and Minnesota does not allege that Sheriff Trevino has acted wrongfully to date in connection with Castro's detention or would act wrongfully by releasing Castro based on those statutes.

[6] Even if this case presented an issue ripe for adjudication, the same analysis would lead the Court to conclude that Minnesota fails to demonstrate a substantial likelihood of success on the merits. Governor Abbott has not violated the Extradition Act, Extradition Clause, or the UCEA by considering Minnesota's extradition request for three months. Those statutes prescribe no deadline for a governor of the asylum state to complete an investigation and either sign a rendition warrant or deny the request.

## III. Conclusion

For these reasons, the Court concludes that Minnesota has failed to satisfy the requirements of Federal Rule of Civil Procedure 65 to warrant the issuance of a temporary restraining order.

As a result, it is:

**ORDERED** that the Application for Temporary Restraining Order (Doc. 8) is **DENIED**.

Signed on August 26, 2026.

Fernando Rodriguez, Jr.
United States District Judge